## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

MARY ALICE CLARK,
CHRISTOPHER COULTER,
AARON PEREZ, KEVIN NELSON, and
PHILLIP ROSCHER, individually and
on behalf of all others similarly situated,

        **Plaintiffs,**

        v.

CAPITAL VISION SERVICES, LLC,

        **Defendant.**
_____

Case No. 22-cv-10236-DJC

### MEMORANDUM AND ORDER

**CASPER, J.**                             **July 18, 2024**

## I.    Introduction

Named Plaintiffs Mary Alice Clark, Christopher Coulter, Aaron Perez, Kevin Nelson and Phillip Roscher (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this putative collective action against Defendant Capital Vision Services, LLC d/b/a MyEyeDr ("MyEyeDr" or the "Company"), alleging violations of the Fair Labor Standards Act ("FLSA") (Counts I and II), the Pennsylvania Minimum Wage Act of 1968 ("PMWA") (Count III) and Mass. Gen. L. c. 151, § 1A (Count IV), all for the recovery of unpaid overtime. D. 1, 139. Plaintiffs have moved for class certification, D. 165,[1] and MyEyeDr moved to decertify the FLSA

_____

[1] The Court allows Plaintiffs' motion for leave to file a reply brief in support of their class certification motion, D. 230, *nunc pro tunc*, and has considered the proposed reply, D. 230-1, in the resolution of this motion.

collectives, D. 210.[2]  MyEyeDr also has moved for summary judgment as to the claims asserted by plaintiffs Jacob Galba-Bright ("Galba-Bright"), D. 166, Armando Cardona ("Cardona"), D. 169, Marie Alice Clark ("Clark"), D. 172, and Jamshid Firouzi ("Firouzi"), D. 175.  Plaintiffs moved for partial summary judgment as to five issues relating to the applicability of FLSA executive or administrative exemptions, payroll deductions and liquidated damages.  D. 179. Finally, MyEyeDr moved to preclude Plaintiffs' expert, Dr. Liesl Fox, from proffering expert opinions in this case.  D. 208.  For the reasons stated below, the Court DENIES Plaintiffs' motion for class certification, D. 165, and ALLOWS MyEyeDr's motion to decertify the FLSA collectives, D. 210.  The Court DENIES MyEyeDr's motion as to Galba-Bright, D. 166, DENIES the motion as to Cardona, D. 169, DENIES the motion as to Clark, D. 172, and ALLOWS the motion as to Firouzi, D. 175.  The Court DENIES Plaintiffs' motion for partial summary judgment, D. 179.  The Court ALLOWS MyEyeDr's motion to exclude the opinion of Plaintiffs' expert. D. 208.[3]

## II.    Standard of Review

### A.    Class Certification under Rule 23

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims

---

[2] The Court has had the benefit of MyEyeDr's decertification motion papers, D. 210-11, Plaintiffs' opposition to same, D. 231, and oral argument from counsel.  D. 234.  Given the Court's ruling on D. 227 regarding the filing of Plaintiffs' opposition and oral argument, the Court denies Plaintiffs' motion for leave to file a reply in support of their motion for extension of time to make such filing, D. 226, as moot.

[3] After the hearing on the certification, decertification and summary judgment motions, D. 234, MyEyeDr filed a motion to dismiss Plaintiff Jennifer Houck ("Houck") given the earlier suggestion of her death, D. 236 (citing D. 120), and Plaintiffs then moved, unopposed, to substitute her brother, Mark Houck as the personal representative of Houck's estate, D. 239.  Accordingly, the Court allows Plaintiffs' motion for substitution, D. 239, and denies D. 236 as moot.

or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); see In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008). The Court must also determine that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); see In re New Motor Vehicles, 522 F.3d at 18.

"[T]he district court must undertake a 'rigorous analysis' to determine whether plaintiffs me[e]t the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites." In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)); see Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003). Plaintiffs bear the burden of proving that class certification is warranted. Makuc v. Am. Honda Motor Co., Inc., 835 F.2d 389, 394 (1st Cir. 1987). Such showing need not be made "to a degree of absolute certainty," but Plaintiffs must make their Rule 23 showing by a preponderance of the evidence. Nexium, 777 F.3d at 27 (internal citation and quotation marks omitted).

### B.    FLSA Collective Decertification

"If a collective is conditionally certified [at the initial step of the FLSA collective certification process], as was the case here, the defendant may move to decertify the collective after the completion of class discovery." DaRosa v. Speedway LLC, 557 F. Supp. 3d 315, 318 (D. Mass. 2021). At this second stage, "the court makes a final similarly situated determination," Romero v. Clean Harbors Surface Rentals USA, Inc., 368 F. Supp. 3d 152, 161 (D. Mass. 2019) (internal citation and quotation marks omitted), and applies "a more stringent standard." Preston v. World Travel Holdings, Inc., No. 1:23-cv-12389-JEK, 2024 WL 519548, at *5 (D. Mass. Feb.

9, 2024) (citation and internal quotation marks omitted). "Pertinent factors at this stage include: (1) any disparate factual and employment settings—for example, whether plaintiffs were employed in the same corporate department, division, and location; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." <u>Romero</u>, 368 F. Supp. 3d at 161 (citing <u>Trezvant</u>, 434 F. Supp. 2d at 45).

### C. <u>Summary Judgment</u>

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." <u>Santiago–Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000); <u>see</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. <u>Borges ex rel. S.M.B.W. v. Serrano–Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997).

### D.    <u>Motion to Exclude Expert Opinion</u>

"The Supreme Court . . . vested in trial judges a gatekeeper function, requiring that they assess proffered expert scientific testimony for reliability before admitting it." <u>Milward v. Acuity Specialty Prods. Grp., Inc.</u>, 639 F.3d 11, 14 (1st Cir. 2011). As a threshold question, the Court must first determine whether the witness is sufficiently qualified by "knowledge, skill, experience, training, or education" to give her proffered opinion. <u>Fed. Ins. Co. v. Pentair Residential Filtration, LLC,</u> No. 12-10853-RGS, 2013 WL 6145531, at *3 (D. Mass. Nov. 21, 2013) (quoting Fed. R. Evid. 702) (internal quotation marks omitted). The Court must next determine whether the specific testimony offered in the case "both rests on a reliable foundation and is relevant to the task at hand." <u>In re Nexium (Esomeprazole) Antitrust Litig.</u>, 842 F.3d 34, 52 (1st Cir. 2016) (quoting <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993) (internal quotation marks omitted)). "The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion." <u>Samaan v. St. Joseph Hosp.</u>, 670 F.3d 21, 31 (1st Cir. 2012). This requirement "seeks to ensure that there is an adequate fit between the expert's methods and his conclusions" by determining whether the expert's conclusions "flow rationally from the methodology employed." <u>Id.</u> at 32 (citations omitted).

## III.    Factual Background

### A.    <u>Plaintiffs' Class Allegations</u>

MyEyeDr provides eye care and eyewear to patients in over 500 clinics across the United States. D. 139 ¶ 36; D. 165 ¶ 2. Each clinic typically has one General Manager ("GM"). D. 165 ¶ 3. GMs and their clinics are grouped by district and report up to a District Manager ("DM"), who reports to a Regional Manager. <u>Id.</u> ¶¶ 6-7. In addition to the GM, each clinic typically has a patient service coordinator ("PSC"), an optometric technician, an eyewear consultant ("EC") and a doctor of optometry ("OD"). <u>Id.</u> ¶ 5.

MyEyeDr categorizes all GMs as exempt employees.  D. 165 ¶ 43.  It maintains uniformity across its stores through standard operating procedures and policies that regulate how each store should operate.  Id. ¶¶ 13-14.  Employees at each MyEyeDr clinic are expected to follow such procedures, id. ¶ 14, and DMs are responsible for making sure GMs adhere to them.  Id. ¶ 37. MyEyeDr also maintains centralized systems for use across locations.  For instance, all employees have access to the company's intranet, known as MyEyeShare, where MyEyeDr houses all policies and procedures, its new hire guide and the company's code of conduct.  Id. ¶¶ 9-10, 13, 15. Additionally, MyEyeDr clinics have access to the following systems:  (1) DayForce, which is used for scheduling employees, entering hours and requesting time off, id. ¶ 16; (2) Power BI, which tracks information regarding individual stores' key performance indicators ("KPIs"), appointment scheduling, call volume and employee bonuses, id. ¶ 17; (3) AcuityLogic, which is used to book appointments, id. ¶ 19; and (4) Binary Fountain, which tracks patient feedback for all stores, id. ¶ 20.  The company also hosts training videos in a centralized location called MyEyeDr University ("MEDU") and tracks employee completion of same.  Id. ¶ 55.  MyEyeDr maintains a list of items to be completed by GMs during their onboarding process.  Id. ¶ 54.

MyEyeDr established guidelines outlining the duties, responsibilities and expectations of GMs across all stores, which, among other things, noted that GMs were expected to work 45 hours per week, arrive thirty minutes before the store opens, close the store at least two nights each week and spend 90% of the time on the retail floor.  Id. ¶ 28; D. 181-9 at 5.  MyEyeDr has established systems of tracking performance metrics at each store.  For instance, each store is given monthly revenue targets and a labor budget, and MyEyeDr monitors performance based on each store's KPIs.  D. 165 ¶¶ 21-22, 24.  GMs are entitled to receive bonuses based on their clinic's performance metrics.  Id. ¶ 45.

### B.     General Managers in Training ("GMITs")

Given Plaintiffs' motion for partial summary judgment as to several matters including their contention that they were not exempt when they worked as GMITs, D. 179 at 1, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 181; D. 190, and accompanying documents.

MyEyeDr formerly had a position titled "GMIT," which it phased out at the end of 2022. D. 181 ¶ 2; D. 190 ¶ 2.  Although MyEyeDr eliminated the formal "GMIT" role, some new GMs continued participating in a training period at the start of their tenure.  D. 181-1 at 20.  MyEyeDr maintains a GMIT training guide, which outlines what a GMIT can expect to learn during their training period.  See D. 181-2.  On average, GMITs trained with a more senior GM for eight weeks but that period could differ.  D. 181 ¶ 3; D. 190 ¶ 3; D. 181-1 at 15.  GMITs shadowed the hourly paid positions in the store, completed online training modules and observed the GM.  D. 181 ¶ 4; D. 190 ¶ 4.  MyEyeDr classified GMITs as exempt.  D. 181 ¶ 3; D. 190 ¶ 3.

### C.     Payroll Deductions

Given Plaintiffs' motion for partial summary judgment as to several matters including that they were not exempt because MyEyeDr made partial day deductions, D. 179 at 1-2, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 181; D. 190, and accompanying documents.

MyEyeDr made partial day deductions from the salaries of certain GMs between April 2017 and March 2023.  D. 181 ¶¶ 6-7; D. 190 ¶¶ 6-7.  When a GM entered time off using the "salaried unpaid time off" code, MyEyeDr's payroll system deducted this time from that GM's salary. D. 181 ¶ 7; D. 190 ¶ 7.  MyEyeDr investigated whether partial day deductions had occurred from the salaries of the GMs who joined this case and then sent letters to those plaintiffs who experienced partial day deductions, explaining that the deductions were inadvertently taken and

that they would be reimbursed for any improper deductions.  D. 181 ¶¶ 8-9; D. 190 ¶¶ 8-9. MyEyeDr continues to allow its GMs to use the "salaried unpaid time off" designation for partial days off and has informed the payroll department to remove any improper partial day deductions. D. 181 ¶ 10; D. 190 ¶ 10.

    **D.**    **Galba-Bright**

Given MyEyeDr's motion for summary judgment as to the claims asserted against Galba-Bright, D. 166, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 168; D. 194; D. 214, and accompanying documents.

Galba-Bright was employed by MyEyeDr from January 2017 to May 2022.  D. 168 ¶ 5; D. 194 ¶ 5.  He first worked as a GMIT for approximately three months before becoming a GM in April 2017.  D. 168 ¶ 7; D. 194 ¶ 7.  Galba-Bright worked in several MyEyeDr clinics in Maryland and Virginia.  D. 168 ¶¶ 8-9, 12, 14-15; D. 194 ¶¶ 8-9, 12, 14-15.  Around February 2020, he was promoted to DM.  D. 168 ¶ 10; D. 194 ¶ 10.  Due to the COVID-19 pandemic, MyEyeDr temporarily closed its clinics in the spring of 2020 and began gradually reopening beginning in May 2020.  D. 168 ¶ 11; D. 194 ¶ 11.  Upon reopening, Galba-Bright returned to work with the title of DM but was acting as the GM of the Gainesville location.  D. 168 ¶ 12; D. 194 ¶ 12.  In August or September 2020, Galba-Bright's job title changed back to GM, and he remained in that role until the end of his employment in May 2022.  D. 168 ¶ 13; D. 194 ¶ 13.

During Galba-Bright's time as a GM, he reported to two DMs:  Michelle Perdomo ("Perdomo") and Paula Castro ("Castro").  D. 168 ¶ 17; D. 194 ¶ 17.  During the time that Perdomo was his DM, Galba-Bright had weekly calls or office visits with her as well as quarterly in-person district meetings, and Perdomo visited his clinic approximately once every ten days.  D. 168 ¶¶ 19-20; D. 194 ¶¶ 19-20.  During the time Castro was his DM, Galba-Bright had weekly conference

calls with her and the GMs in the district, and Castro visited his clinic approximately once every two weeks.  D. 168 ¶¶ 19, 21; D. 194 ¶¶ 19, 21.

As a GM, Galba-Bright was responsible for overall clinic operations and performance, including managing his team, providing quality patient service, ensuring the clinic was well-staffed, handling customer complaints and increasing the profitability of his clinic.[4]  D. 168 ¶ 22. Galba-Bright was responsible for scheduling the employees who worked in his clinic, including finding coverage for shifts as needed even if he "sometimes" requested assistance from his DM or other GMs for coverage.  D. 168 ¶ 42; D. 194 ¶ 42.  He prepared plans for daily huddles with his team as well as annual plans for the clinic, identifying strategies for performance growth.  D. 168 ¶ 32; D. 194 ¶ 32.  Galba-Bright also led monthly meetings with his office staff to review the clinic's performance, identify areas of opportunity and discuss upcoming events and the associate experience.  D. 168 ¶ 33; D. 194 ¶ 33.  He provided coaching, training and feedback to his employees.  D. 168 ¶¶ 36, 39, 45; D. 194 ¶¶ 36, 39, 45.

During his employment, Galba-Bright supervised more than two, and sometimes up to fifteen, employees.  D. 168 ¶ 34; D. 194 ¶ 34.  He was responsible for addressing any issues that came up in the clinic.  D. 168 ¶ 35; D. 194 ¶ 35.  Galba-Bright spent 70% of his workday servicing patients by assisting with patient check-in, appointment scheduling, phones, sales, product displays and insurance verification.  D. 194 ¶¶ 62-63; D. 214 ¶¶ 62-63.

Galba-Bright did not have authority to terminate employees, but if an issue came up, he could discuss behavior concerns with the employee, and, if necessary, he could partner with his DM or Human Resources ("HR") to address misconduct warranting disciplinary action, including

---

[4] Although Galba-Bright claims that "performing these duties was an aspirational expectation of MyEyeDr," D. 194 ¶ 22, his testimony confirms that he did perform these tasks.  See D. 168-2 at 14, 22, 24, 30-31, 39, 43.

written warnings.  D. 168 ¶ 47; D. 194 ¶ 47.  Any ongoing concerns with the employee would need to be flagged to the DM or HR, who would make a determination as to termination.  D. 168 ¶ 47; D. 194 ¶ 47.  On separate occasions, two employees failed to show up to multiple scheduled shifts, so Galba-Bright sought permission to terminate so that the position could be refilled.  D. 168 ¶ 49; D. 194 ¶ 49.  In both instances, his DM or HR decided to terminate the employee.  D. 168 ¶ 49; D. 194 ¶ 49.

In May 2018, Galba-Bright earned an annual salary of $61,650, which increased to $82,080 in April 2022.  D. 168 ¶ 57; D. 194 ¶ 57.  Since 2019, he earned a total of $18,550 in bonuses as a GM.  D. 168 ¶ 58; D. 194 ¶ 58.  Galba-Bright earned bonuses by ensuring that his clinic performed well.  D. 168 ¶¶ 55-56; D. 194 ¶¶ 55-56.

### E.    Cardona

Given MyEyeDr's motion for summary judgment as to Cardona's claims, D. 169, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 171; D. 204; D. 218, and accompanying documents.

Cardona worked in the call center of an eyewear company that was acquired by MyEyeDr in 2019.  D. 171 ¶ 6; D. 204 ¶ 6.  After the acquisition, Cardona held various positions at MyEyeDr, including Optometric Technician, EC and Assistant General Manager.  D. 171 ¶¶ 7-9; D. 204 ¶¶ 7-9.  For approximately a month and a half to two months, Cardona led his clinic as "acting GM" as the Company looked to fill the GM role.  D. 171 ¶ 13; D. 204 ¶ 13.  Cardona was promoted to GM of the Downtown Denver clinic in about July 2022.  D. 171 ¶ 14; D. 204 ¶ 14.  After his promotion, Cardona did not participate in any formal training for the position as GM but completed computer-based training.  D. 171 ¶¶ 15, 17; D. 204 ¶¶ 15, 17.  For some time as a GM, Cardona had to fill in as a technician on Mondays due to staffing needs.  D. 204 ¶ 75; D. 218 ¶ 75.

As a GM, Cardona was compensated at a salary of $62,000 and was eligible for bonuses based on the financial performance of his clinic.  D. 171 ¶¶ 67-68; D. 204 ¶¶ 67-68.  His clinic team had eight associates, seven of whom were full-time.  D. 171 ¶ 35; D. 204 ¶ 35.  During Cardona's time as a GM, he reported to two DMs:  Jennifer Fields ("Fields") and John Coombes ("Coombes").  D. 171 ¶¶ 19-20; D. 204 ¶¶ 19-20.  In the period between Fields's departure and Coombes's arrival, Cardona received no communication from the DM who had been temporarily assigned to his clinic during this time. D. 171 ¶ 21; D. 204 ¶ 21.  Cardona's DMs did not regularly work from his clinic and typically visited the office once per week.  D. 171 ¶ 18; D. 204 ¶ 18. Cardona participated in weekly video conferences with his DM and other GMs in the district, D. 171 ¶ 25; D. 204 ¶ 25, and was expected to share performance metrics with his DM daily.  D. 204 ¶ 83; D. 218 ¶ 83.

Cardona spent most of his time at the front desk, where he was able to observe the sales floor.  D. 171 ¶ 24; D. 204 ¶¶ 24, 73; D. 218 ¶ 73.  The bulk of Cardona's day consisted of checking patients in and out, answering phones, scheduling appointments, verifying insurance, checking in contact lens orders and selling eyeglasses and contact lenses.  D. 204 ¶ 74; D. 218 ¶ 74.  According to Cardona, these duties consumed 85% of his workday.  D. 204 ¶ 74; D. 218 ¶ 74.  Cardona was also responsible for monitoring his team's performance, providing consistent coaching, feedback and mentoring, conducting performance evaluations and scheduling the employees in his clinic. D. 171 ¶¶ 37, 43, 46; D. 204 ¶¶ 37, 43, 46.  To prepare a schedule, Cardona distributed hours to his team pursuant to an hour budget and he was expected to stay within this limit, but had scheduled over that limit in the past. D. 171 ¶¶ 46-48; D. 204 ¶¶ 46-48, 79; D. 218 ¶ 79.  Cardona's allocation of his clinic's budgeted hours impacted his performance metrics and bonus.  D. 171 ¶ 51; D. 204 ¶ 51.

Cardona was involved in the hiring process for his clinic, and he provided his hiring recommendations about candidates to his DM, who would then decide whether to hire the candidate. D. 171 ¶¶ 52, 55; D. 204 ¶¶ 52, 55. Cardona engaged in informal conversations with staff regarding performance issues and, if he determined termination was necessary, he would contact HR for advice and agreement before addressing it with the employee. D. 171 ¶¶ 58-63; D. 204 ¶¶ 58-63, 92; D. 218 ¶ 92.

### F. Clark

Given MyEyeDr's motion for summary judgment as to Clark's claims, D. 172, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 174; D. 200; D. 216, and accompanying documents.

Clark was employed as a GM at MyEyeDr from October 2020 to June 2021 in the Brookline, Massachusetts clinic. D. 174 ¶ 6; D. 200 ¶ 6. Clark spent eight days training over the course of two weeks at MyEyeDr's Newton, Massachusetts clinic. D. 174 ¶ 8; D. 200 ¶ 8. During those two weeks, Clark participated in on-the-job training, shadowed another GM and learned about the duties of other clinic positions. D. 174 ¶ 9; D. 200 ¶ 9. Clark earned an annual salary of at least $64,000. D. 174 ¶ 48; D. 200 ¶ 48. She was eligible for performance-based bonuses, which she could earn by increasing the profitability of her clinic and by ensuring that her clinic met certain performance metrics. D. 174 ¶¶ 44-46; D. 200 ¶¶ 44-46. Clark, however, never earned a bonus because her clinic did not meet the relevant performance metrics. D. 174 ¶ 47; D. 200 ¶ 47.

During her time at MyEyeDr, Clark reported to two DMs: Marsha Hutchinson ("Hutchinson") and Jodi Leffingwell ("Leffingwell"). D. 174 ¶¶ 13-14; D. 200 ¶¶ 13-14. Clark's DMs did not regularly work in her clinic but did visit the stores. D. 174 ¶ 17; D. 200 ¶¶ 17, 93; D. 216 ¶ 93. In addition to store visits, Clark communicated with Leffingwell daily through Teams

12

chat, phone calls, email or text messages.  D. 200 ¶¶ 94-95; D. 216 ¶¶ 94-95.  From December 2020 until February 2021, Clark did not have an assigned DM and ran her clinic without a direct supervisor.  D. 174 ¶ 14; D. 200 ¶ 14.

As a GM, Clark was responsible for managing the profits and losses of her clinic, onboarding new hires, scheduling employees and ensuring that the clinic was appropriately staffed, which included finding coverage for associates as needed.  D. 174 ¶¶ 21, 34, 38; D. 200 ¶¶ 21, 34, 38.  Clark spent most of her time on the sales floor selling glasses and contacts, filling appointments, answering the phone, pulling insurance, checking in patients and dispensing glasses.  D. 200 ¶¶ 63-64; D. 216 ¶¶ 63-64.  If the store was short staffed, Clark was expected to step in wherever there was a vacancy.  D. 200 ¶ 71; D. 216 ¶ 71.  Although Clark could not make final hiring decisions, she assisted with the hiring process by doing some interviews of candidates and, in the course of same, made recommendations of which to hire.  D. 174 ¶¶ 36, 41; D. 200 ¶¶ 36, 41.  Clark could not write-up an employee for disciplinary purposes nor terminate an employee without the approval of HR.  D. 200 ¶¶ 106, 108; D. 216 ¶¶ 106, 108.

G.    **Firouzi**

Given MyEyeDr's motion for summary judgment as to the claims asserted by Firouzi, D. 175, the following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, D. 178; D. 197; D. 220, and accompanying documents.

Prior to joining MyEyeDr, Firouzi ran two optical practices for fifteen years.  D. 178 ¶¶ 8-9; D. 197 ¶¶ 8-9.  In 2007, Firouzi sold his optical clinics to MyEyeDr.  D. 178 ¶ 12; D. 197 ¶ 12. Following the acquisition, Firouzi joined MyEyeDr as a GM and stayed in that role from 2007 to April 5, 2020.  D. 178 ¶¶ 5, 13; D. 197 ¶¶ 5, 13.  On April 6, 2020, Firouzi became an hourly Assistant Manager until his resignation in December 2021.  D. 178 ¶ 5; D. 197 ¶ 5.  He worked in the Aspen Hill, Maryland clinic throughout his employment with MyEyeDr except from around

March 2019 to August 2019 when he was the GM of the Columbia, Maryland clinic.  D. 178 ¶ 7; D. 197 ¶ 7.  Firouzi opted into this case on September 15, 2022.  D. 178 ¶ 6; D. 197 ¶ 6.

## IV.    Procedural History

Plaintiffs filed this action on February 11, 2022.  D. 1.  Plaintiffs moved for conditional certification of two FLSA collectives (the "FLSA GM Collective" and the "FLSA GMIT Collective"), D. 20, which the Court allowed, D. 42.  MyEyeDr moved to dismiss six opt-in plaintiffs for failure to respond to discovery requests, D. 79, which the Court allowed in part and denied in part, D. 83; D. 88.  MyEyeDr moved to dismiss opt-in plaintiff Jennifer Peterson for failure to appear at her deposition or otherwise prosecute her claims, D. 118, which the Court allowed, D. 134.  Plaintiffs have now moved for class certification, D. 165, and MyEyeDr has moved to decertify the FLSA collectives, D. 210.  MyEyeDr has now moved for summary judgment as to plaintiffs Galba-Bright, D. 166, Cardona, D. 169, Clark, D. 172, and Firouzi, D. 175.  Plaintiffs have moved for partial summary judgment.  D. 179.  Finally, MyEyeDr moved to exclude the opinion of Plaintiffs' expert.  D. 208.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 234.

## V.    Discussion

### A.    <u>Statutory Background</u>

The FLSA requires employers to pay overtime wages "at a rate not less than one and one-half times the regular rate" to employees who work in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  "[A]ny employee employed in a bona fide executive, administrative, or professional capacity," however, is exempt from the overtime compensation requirement.  29 U.S.C. § 213(a)(1).  "The burden is on the employer to prove an exemption from the FLSA's requirements." <u>Marzuq v. Cadete Enter., Inc.</u>, 807 F.3d 431, 438 (1st Cir. 2015).

### 1.    Executive Exemption

Pursuant to the Department of Labor ("DOL") regulations that were in effect during the relevant time period, an employee is exempt under the executive exemption if (1) the employee's salary is at least $684 per week,[5] (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof," (3) the employee "customarily and regularly directs the work of two or more other employees," and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a); Marzuq, 807 F.3d at 435. "Each of these requirements must be met for the exemption to apply." Marzuq, 807 F.3d at 435. "A genuine dispute as to any of the four requirements is sufficient to deny summary judgment." Hamel v. Wheatleigh Corp., No. 3:18-cv-30113-KAR, 2021 WL 3516449, at *3 (D. Mass. Aug. 10, 2021) (internal quotation marks omitted) (quoting Roberts v. TJX Companies, Inc., No. 13-cv-13142-ADB, 2017 WL 1217116, at *7 (D. Mass. Mar. 31, 2017)).

### 2.    Administrative Exemption

An employee is exempt under the administrative exemption if (1) the employee's salary is at least $684 per week, (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); Walsh v. Unitil Serv. Corp., 64 F.4th 1, 5 (1st Cir. 2023). Like the executive

---

[5] As of July 1, 2024, the salary requirement increased to $844 per week. 29 C.F.R. § 541.600(a)(1). The Court, however, applies the $684 per week requirement that was previously in effect and this is the salary figure that the parties applied in their papers. See, e.g., D. 167 at 3; D. 193 at 7.

exemption, "each of the three prongs must be satisfied and the employer bears the burden of establishing each prong." Walsh, 64 F.4th at 5.

**B.    Plaintiffs' Motion for Class Certification**

Plaintiffs claim that MyEyeDr misclassified its GMs as exempt in violation of Massachusetts and Pennsylvania law (Counts III-IV).[6] D. 139 at 24-26. Plaintiffs moves to certify two classes based on these state-law claims pursuant to Rule 23(b)(3) consisting of individuals who have worked as GMs for MyEyeDr stores in (1) Massachusetts and (2) Pennsylvania since March 21, 2019. D. 165 at 2.

*1.    Numerosity*

To certify a class action, "the class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no threshold number of class members that automatically satisfies this requirement." Shanley v. Cadle, 277 F.R.D. 63, 68 (D. Mass. 2011) (citing Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n, 446 U.S. 318, 329 (1980)). Courts, however, have generally found that a class size of forty or more individuals will satisfy the numerosity requirement. In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003). Plaintiffs assert that following the Court's conditional certification of the FLSA collectives, they sent notice to those who had worked as GMs and GMITs for MyEyeDr including 300 individuals (15 of whom have worked in stores in Massachusetts and 25 of whom worked in stores in Pennsylvania). D. 165 at 12; D. 165-5 ¶ 3. MyEyeDr does not appear to challenge that the

---

[6] The Court considers cases arising under the FLSA because Massachusetts and Pennsylvania law are "nearly identical" or "essentially identical" to the FLSA. Tomaz v. MAX Ultimate Food, Inc., No. 19-10533-RGS, 2020 WL 5517458, at *3 (D. Mass. Sept. 14, 2020); Szabo v. Muncy Indus., LLC, 661 F. Supp. 3d 337, 343 n.55 (M.D. Pa. 2023).

numerosity requirement has been satisfied and the Court concludes that Plaintiffs have established numerosity.

### 2. Commonality

Plaintiffs must also demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A question is common if it is 'capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Parent/Pro. Advoc. League v. City of Springfield, 934 F.3d 13, 28 (1st Cir. 2019) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). It is not critical whether common "questions" are raised; the decisive factor is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (emphasis in original) (quoting Wal-Mart, 564 U.S. at 350). The commonality requirement is not to be conflated with the predominance criterion, which is "far more demanding." In re New Motor Vehicles, 522 F.3d at 20 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997)). The commonality requirement is, by comparison, a "low bar." Id. at 19; In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., No. MDL 09-02067-NMG, 2014 WL 108197, at *6 (D. Mass. Jan. 10, 2014) (noting that commonality "is a 'low hurdle' that can be met with even a single common legal or factual issue" (quoting Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 259 (D. Mass. 2005)).

Although the Court recognizes that MyEyeDr devotes much of its challenge to class certification on the grounds that Plaintiffs have failed to show both commonality under Rule 23(a) and predominance under Rule 23(b)(3), D. 185 at 12-21, the Court concludes that those issues concern predominance more than commonality. Moreover, given the low bar for the commonality prong, the fact that all plaintiffs served in the same role of GM, which was governed by common policies may be enough to meet the commonality requirement and the Court assumes, without

deciding, that it has been satisfied here.  Even so, Plaintiffs have not met the higher standard for predominance, as individual determinations predominate here, as addressed below.

### 3.    *Typicality*

Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The class representatives' claims are "typical" when their claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory."  García-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) (internal citation and quotation marks omitted) (alterations in original).  MyEyeDr makes a passing challenge to typicality in a footnote, D. 185 at 13 n.15, but its challenge bears more upon commonality and predominance as addressed above and below.  Here, the putative class members all assert the same injury, namely that they were misclassified as exempt employees during their tenure as GMs and MyEyeDr improperly denied them overtime wages.  Plaintiffs have, therefore, satisfied the typicality requirement.

### 4.    *Adequacy*

Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy of representation is met by a two-part inquiry.  "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."  Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

MyEyeDr contends that "Named Plaintiffs have no understanding of what it means to be a class representative" and "lack a comprehensive understanding of the claims they asserted and their alleged involvement in the case."  D. 185 at 5.  In support of this contention, MyEyeDr cites

testimony from Clark's deposition.  Clark testified that her understanding of the claims that she has asserted in this litigation relate to "regularly work[ing] . . . over 40 hours without any overtime pay" while "doing the job of everybody on the team" without "hav[ing] total control over many different aspects of the office."  D. 174-1 at 14.  Clark's testimony expresses an understanding of the core legal claims, namely that MyEyeDr allegedly denied her overtime compensation despite performing primarily nonexempt duties.  In the absence of evidence showing that a potential conflict exists between named plaintiffs and other class members, the Court concludes that Named Plaintiffs adequately represent the class.

MyEyeDr also challenges the adequacy of Plaintiffs' counsel's representation.[7]  D. 185 at 4.  In determining whether class counsel is adequate, the Court must consider:  (i) counsel's work to identify and investigate the potential claims; (ii) counsel's experience in handling class actions or other complex litigation, as well as the types of claims in this case; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  The Court now turns to MyEyeDr's specific challenges to class counsel.

First, Plaintiffs are presented by several firms, not just the Shavitz Law Group.  For one example, attorney Sam Smith, partner at Burr & Smith, LLP, one of the law firms representing Plaintiffs in this action, attests that his law firm "has a national practice of representing employees in wage and hour class and collective actions under the FLSA and state statutes" and thus has

---

[7] MyEyeDr challenges the representation of the Shavitz Law Group but argues that any misconduct is imputed to the other law firms because the firms have acted in concert.  D. 185 at 4 n.4.  MyEyeDr, however, does not suggest that counsel from the other firms were involved in the solicitation efforts at issue.

"substantial experience" litigating class actions.  D. 165-5 ¶ 1.  Smith himself appears to have

significant experience in this area of the law as well, see id. ¶ 2, and the other class counsel (and

their firms) appear to have similar breadth of experience.  D. 165 at 22, D. 230-1 at 11-12 & n.2

and cases cited.  Plaintiffs' attorneys have been pursuing these claims on their behalf since

February 2022 and have completed discovery of the case.  Given these facts, the Court finds that

class counsel adequately represents Plaintiffs.

   MyEyeDr argues that the Shavitz Law Group's solicitation of Plaintiffs in this case was

misleading and "deliberately obscure[ed]" the fact that no litigation had commenced to lure in

plaintiffs.  D. 185 at 4.  In Creative Montessori Learning Ctrs. v. Ashford Gear LLC, 662 F.3d

913, 916 (7th Cir. 2011), one of the cases upon which MyEyeDr relies, class counsel retained its

named plaintiff by sending a solicitation that stated as follows: "during our investigation, we have

determined that you are likely to be a member of the class . . . if the lawsuit is successful, you

would receive compensation (up to $1,500) for each junk fax sent. We would like to discuss this

issue with you. Please call me [telephone number]." Id.  The district court found that class counsel

had engaged in misconduct by, in part, sending the misleading communication to plaintiff implying

"that there already was a certified class to which [plaintiff] belonged." Id. at 917.  The district

court nonetheless concluded that class counsel could adequately represent the class.  Id.  The

Seventh Circuit disagreed and vacated class certification, reasoning that "[t]here is no basis for

confidence that [counsel] would prosecute the case in the interest of the class, of which they are

the fiduciaries . . . rather than just in their interest as lawyers who if successful will obtain a share

of any judgment or settlement as compensation for their efforts." Id. (internal citations omitted).

   MyEyeDr contends that class counsel here engaged in similar misleading solicitation

efforts.  Class counsel messaged Eduardo Llorentis ("Llorentis") on LinkedIn "to inquire if [he]

experienced . . . [b]eing paid a salary but misclassified as exempt from overtime" or "[b]eing misclassified as exempt from overtime wages and paid only a set salary while in training."  D. 185-2 at 2.  The message further noted that "[i]f so, [he] may claim unpaid overtime wages for the past three (3) years, plus an additional equal amount of damages."  Id.   Although Llorentis appeared to interpret this message to mean that there was an "overtime lawsuit for the misclassification of general managers" "going on," D. 98-10 at 5-6, the communication itself does not imply that a lawsuit has begun or is ongoing.  Unlike the solicitation in Creative Montessori, class counsel does not suggest having undertaken any sort of investigation into Llorentis's claims nor does the message mention a "class" or a "lawsuit."  Compare Creative Montessori, 662 F.3d at 916, with D. 185-2 at 2.  Similarly, the allegation about the alleged "harassment" of opt-in plaintiff Angela Young also does not provide a basis for challenging the adequacy of class counsel's representation.  Counsel correctly informed Young that MyEyeDr had moved to dismiss her since she had been unresponsive and was also requesting attorneys' fees and, appropriately, that the firm would proceed with withdrawing from representing her if it did not hear from her within six days.  D. 230-1 at 32.  Lastly, to the extent that MyEyeDr invokes sanctions and disqualification of Shavitz Law Group in another case fifteen years ago, that does not change the facts here or the fact that Plaintiffs are represented by qualified counsel from several firms.

For the aforementioned reasons, the Court concludes that Plaintiffs have satisfied the adequacy requirement.

### 5.    *Predominance*

Rule 23(b)(3) requires the Court to conclude that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Since MyEyeDr does not address the superiority part of

Rule 23(b)(3), <u>see</u> D. 185 at 21, the Court turns to the Rule 23(b)(3) requirement that it does challenge, predominance.

The focus of the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>, 521 U.S. at 623.  When conducting a Rule 23(b)(3) analysis, the Court must determine whether there is "reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate."  <u>Halliburton Co. v. Erica P. John Fund Inc.</u>, 573 U.S. 258, 276 (2014).  This requires a district court to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."  <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 298 (1st Cir. 2000).

In assessing predominance, the Court must consider MyEyeDr's asserted defenses, namely whether Plaintiffs were exempt employees pursuant to the executive or administrative exemptions. MyEyeDr argues that the record evidence reflects substantial variation in the job duties, responsibility, discretion and authority that GMs held such that determining exempt status would require "[h]ighly individualized, fact intensive inquiries" that would "consume the trial and overwhelm common issues."  D. 185 at 21.

a)    <u>Individual Issues Predominate in Determining Whether the<br>Executive Exemption Applies</u>

The executive exemption raises several factual questions, which cannot be answered in the collective.  The Court turns to the four-prong test for the executive exemption under 29 C.F.R. § 541.100(a) to explain.

*As to the salary basis prong.*  Even as to the salary basis prong, which applies to both the executive and administrative exemptions, Plaintiffs suggest that some class members may have been subject to improper pay deductions.  In assessing whether the salary basis prong is met, the

Court must determine whether (1) an employee was subjected to a partial day deduction, (2) such deduction was improper and (3) the deduction caused the plaintiff's salary to fall below the $684 salary threshold enumerated by the exemptions.  See D. 185 at 20.  This is not a common issue as it is undisputed that not all GMs were subject to a partial day deduction.  See id.; D. 195-3 at 96; D. 165-4 at 7, 17.  The record also includes testimony explaining that there are circumstances in which a partial day deduction was not improper, such as intermittent Family and Medical Leave Act leave.  D. 190-11 at 13.  Upon making the individualized determinations of whether any given GM experienced a partial deduction and whether that partial deduction was improper, the factfinder would have to determine whether the deduction amount (which may be different for different class members) reduced the plaintiff's salary below the required threshold.  Given the individualized assessments that would be required to do so, individualized issues would predominate over any common issue regarding the salary basis required for the executive (and the administrative) exemption to apply.

*As to the "primary duty" of "management" prong.*  Pursuant to the DOL regulations, "management" includes, but is not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs" and instruct that "[d]etermination of an employee's

primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

The record reveals that individualized assessments will predominate over common issues in determining whether management was the primary duty of any given GM. As to the relative importance of exempt versus non-exempt duties and the time spent performing the former, the GMs' actual job duties differed and some exercised different levels of managerial responsibilities and authority. "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," but "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b). An employee may still be an exempt employee even if he also performs nonexempt work. Rooney v. Town of Groton, 577 F. Supp. 2d 513, 526 (D. Mass. 2008) (citing 29 C.F.R. § 541.106). By way of example, "an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management" because he "can supervise employees and serve customers at the same time." 29 C.F.R. § 541.106(b).

Given the record here, making this assessment as to the balance of the GM's exempt and non-exempt duties will require individualized analysis. For a few examples, Cardona testified that if he was at the front desk doing something else but observed a patient interaction that he thought would result in a negative patient experience, he would address that situation with the team member. D. 171-3 at 27. Nelson also described that if he was on the frame floor working with a patient and observed an employee behaving inappropriately, he would address it with that employee. D. 185-16 at 8. Eric Corbin was able to perform managerial duties while on the sales floor and did not find that those sales duties distracted him from his management duties. D. 185-8 at 5-6. Clark, on the other hand, testified that she did not have time to perform many of her managerial duties because all of her time was taken up performing nonexempt tasks. D. 174-1 at 38, 45, 50-51. Smith similarly testified that she was expected to monitor her associates' performance and identify areas for improvement but could not do so because she spent her time working on the floor. D. 185-7 at 7.

Individual issues predominate as to the assessment of other management activities, including for one example, "directing the work of employees." 29 C.F.R. § 541.102. For example, Diana West testified that she was in the office by herself the majority of the time. D. 185-3 at 3-4. On the other hand, Milton McCall had five people reporting to him, D. 185-17 at 5, Galba-Bright, "at peak," had as many as fifteen employees working with him, D. 168-2 at 20, and Shane Frye had eighteen, D. 232-14 at 10. Some GMs were involved in providing coaching and performance evaluations to associates and others were not. Galba-Bright provided coaching, training and feedback to his associates and completed performance evaluations for the associates he supervised. D. 168 ¶¶ 39-41; D. 194 ¶¶ 39-41. Heather Smith similarly completed formal performance evaluations for some of her employees. D. 185-7 at 8. By contrast, Kevin Nelson

testified that his DM handled performance reviews of his clinic's associates and he had limited input. D. 185-16 at 5-6. Linda Gilroy rejected the characterization of providing "coaching" to the employees in her store, explaining that she and the other employees "worked as a team together." D. 185-14 at 3. Coulter testified that he "was afforded the opportunity to you [sic] manage teams in prior companies, not [at MyEyeDr]." D. 185-15 at 6.

As to the relative freedom from supervision, this factor "considers only the *relative* freedom from supervision; it does not demand complete freedom from supervision." Harris v. Wheatleigh Corp., No. 3:18-cv-30114-KAR, 2021 WL 3848147, at *6 (D. Mass. Aug. 27, 2021) (internal quotation marks omitted and emphasis in original) (quoting Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 507 (6th Cir. 2007)). For one example, there is some evidence to suggest that Cardona was operating with freedom from supervision as to the level of visitation and communication from his DMs, and when scheduling, Cardona had discretion in how he allocated hours among his staff, D. 171-3 at 24, but he still was required to stay within the limits of the budgeted hours for his clinic, D. 171-3 at 10-12, and he did need approval to schedule employees in excess of the clinic's allotted hours. D. 171-3 at 22-23. From December 2020 until February 2021, Clark did not have an assigned DM and ran her clinic without a direct supervisor, D. 174 ¶ 14; D. 200 ¶ 14, even as there were more senior GMs she could contact, D. 174-1 at 25-26. Conversely, as discussed further below as to the summary judgment motion regarding her claims, there were also limits to Clark's freedom to make decisions on her own.

The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee considers "the wage differential between the purported exempt executive's salary and the wages paid to hourly employees who perform

similar non-exempt work."[8] <u>Hamel</u>, 2021 WL 3516449, at *7.  Such wage differential "may reveal the value the employer places on the additional management duties."  <u>Bucceri v. Cumberland Farms, Inc.</u>, No. 15-cv-13955-IT, 2019 WL 3755442, at *5 (D. Mass. July 18, 2019).  "If the differential with the next highest paid employee is large, the different wage rates support the conclusion that the managerial duties are of importance and thus may be the employee's 'primary duties,' and if the differential is small, the wage rates support the conclusion that the management duties are not that important to the employer, and are unlikely to be the employee's primary duties."  <u>Id.</u>  The only evidence on this issue appears to be Dr. Fox's conclusion that the "average hourly rate for the salaried GM and GMIT opt-in plaintiffs, assuming they worked an overall average of 54.55 hours per week and would have been paid an overtime premium for hours worked over 40 in a work week, was $17.91" and the "average hourly rate of pay for non-exempt, hourly employees supervised" by same was $17.24, a $0.67 differential.  D. 229-1 at 6.  Even assuming the Court had not excluded Dr. Fox's opinion, as discussed further below, in part on reliability grounds, it is unclear how meaningful this alleged small gap between the average salaries is given the disputes, among other things, about the variance in managerial duties of different GMs.  Given these circumstances, the Court is unable to reach any meaningful conclusion about this factor.

Nonetheless, given the analysis of the other factors bearing upon whether the GM's primary duty was management, the Court concludes that the individual issues will predominate common issues.

---

[8] MyEyeDr cites the Fourth Circuit's two-part test for evaluating this factor, which first looks at "whether the manager earned more, in absolute terms, than nonmanagerial employees, and second, whether the manager was a 'profit center,' namely, whether the manager had the ability to influence the amount of her compensation."  <u>In re Fam. Dollar FLSA Litig.</u>, 637 F.3d 508, 517 (4th Cir. 2011).  The First Circuit, however, does not appear to have adopted this two-part test.

*As to the "customarily and regularly directs the work of two of more other employees" prong.* As to this issue, Plaintiffs contend that payroll data shows that it was not always the case for GMs. D. 180 at 20-21. Customarily and regularly "means a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701. Two or more employees is "generally considered to mean 80 hours of work [per week] by subordinate employees." Rooney, 577 F. Supp. 2d at 529 (alteration in original) (quoting Murray v. Stuckey's, Inc., 50 F.3d 564, 568 (8th Cir. 1995)); see Brown v. Wheatleigh Corp., No. 3:18-cv-30056-KAR, 2021 WL 4079779, at *5 (D. Mass. Sept. 8, 2021) (noting that the First Circuit has found supervision of two or more full-time employees "76% of the time to be too low to satisfy the 'customarily and regularly' requirement") (citing Sec'y of Lab. v. Daylight Dairy Prods., Inc., 779 F.2d 784, 788 (1st Cir. 1985)).

Even as the Court has excluded the opinion of Dr. Fox for reasons discussed below, it has considered analysis of the underlying payroll records. She relied upon these underlying payroll data to conclude that fifteen of the 59 discovery plaintiffs "which is proportionally equal to more than 25 percent of the Plaintiffs" did not supervise "the equivalent of two full-time employees in 80% of their workweeks." D. 180 at 23. Even this record, where the representative sample represents only a quarter of the class, suggests that satisfying this prong of the executive exemption test would require analyzing the payroll data of each individual member and comparing it to the payroll data of the hourly employees who worked with them each week. That is, the distinctions in the GMs' actual duties do not lend themselves to a clear "yes" or "no" answer as to whether MyEyeDr GMs' were exempt under either the executive or administrative exemptions.

*As to "authority to hire or fire" or have recommendations regarding same "given particular weight" prong.* Factors to consider in determining whether an employee's suggestions

and recommendations are given "particular weight" include "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The record shows that the authority or particular weight given to the GMs' recommendations regarding hiring and firing differed. For some examples, Kevin Nelson described sitting in on some interviews but his testimony did not reflect that his recommendations to his DM was given any particular weight. D. 232-27 at 8. Eduardo Llorentis recommended termination of an employee to his DM but no action was taken. D. 185-6 at 5-6. On the contrary, Cardona interviewed candidates and provided hiring recommendations to his DM, which were followed. D. 171-3 at 28. Somewhere between these two poles, Clark interviewed candidates and noted that her recommendations regarding hiring were "sometimes" taken. D. 174-1 at 36.

On this developed record, the Court concludes that individualized issues will predominate over common issues in determining MyEyeDr's defense that the executive exemption applies to the Plaintiffs' claims.

b)    Individual Issues Predominate in Determining Whether the Administrative Exemption Applies

For similar reasons, the determination of the administrative exemption as a defense to Plaintiffs' claims involves the predominance of individual issues over common issues.

*As to the salary prong.* The same analysis applies here as it did for the executive exemption as the requirement is the same given the issue of partial day deductions that apply to some class members.

*As to the "primary duty" "directly relates to the management or general business operations of the employer" or its customers prong.* The DOL regulations instruct that "[t]o meet

29

this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a). Work directly related to management or business operations my include:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).  The First Circuit has clarified that the analysis the Court must conduct when evaluating this second element is a "relational" one.  Walsh, 64 F.4th at 6.  First, the Court must "clearly identify the primary duty of the employee(s) in question" and then "determine whether that duty is directly related to 'running or servicing of the business.'"  Id. (quoting 29 C.F.R. § 541.201(a)).   The primary duty determination is similar to that of the executive exemption.  See Rooney, 577 F. Supp. 2d at 528 (explaining that the standards for the executive and administrative exemptions are similar, the difference being "that with the executive exemption, the primary duty must be management and with the administrative exemption, the primary duty must be related to assisting with the running of the business").

To determine whether the employee's primary duty directly relates to the management or business operations, the Court should "identify and articulate the business purpose of the employer," meaning "'the very product or service that the' employer or its customers 'offers to the public.'"  Walsh, 64 F.4th at 6 (quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997)).   The Court "may then compare the employee's primary duty to the business purpose of the employer and/or the employer's customers to determine whether the employee's primary duty directly relates to the business purpose or, conversely, is directly related to the 'running or

servicing of the business.'" Id. 6-7 (quoting 29 C.F.R. § 541.201(a)). If the employee's primary duty relates to the employer's business purpose "in that [he] produce[s] the product or provide[s] the service that the company is in business to provide, the second prong is not satisfied." Id. at 7. If, however, an employee's primary duty is "ancillary" to the company's business purpose or "principal production activity," then he "may qualify for the exemption." Su v. F.W. Webb Co., 677 F. Supp. 3d 7, 19 (D. Mass. 2023); Walsh, 64 F.4th at 7.

In Marcus v. Am. Cont. Bridge League, 80 F.4th 33 (1st Cir. 2023) ("Marcus II"), the court addressed whether the administrative exemption applied. Marcus II, 80 F.4th at 47. After concluding that the defendant employer was in the business of sanctioning bridge tournaments, it then ruled that the primary duty of the tournament directors was to supervise bridge tournaments, which "when considered in relation to [defendant's] business purpose, is the very service that [defendant] [was] in the business of providing." Id. The court noted that although the employer "may have additional duties such as training and mentoring other directors in tournament-related areas, guiding disputes concerning game play, and/or drafting tournament regulations, these duties all go towards producing" defendant's bridge tournament. Id.

As to field supervisors and area managers, however, the court in Marcus II concluded that those positions met the requirements of the administrative exemption because even though they "may spend approximately 75 percent of their time tournament directing," they were also "expected to develop, implement, and manage strategic and long-term processes and programs, including tournament planning/review and plans to maintain standards of player satisfaction." Id. at 48. They were also "expected to be the '[f]irst point of contact for issues related to tournament operations and staff' and to '[e]stablish and maintain effective relationships with tournament sponsors.'" Id. at 48-49 (alterations in original). The court concluded that "[t]hese high-level

customer service-oriented responsibilities" directly related to defendant's business operations.  Id. at 49.

There was individual variation as to this matter as discussed above (and as further illustrated in the analysis, infra, as to MyEyeDr's motion for summary judgment as to the claims by Cardona).  On this record, answering whether a GM's primary duty related to management will require an individualized determination given the variation in actual duties performed by class members.

As to the "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance" prong.    As noted above, there was individual variation in whether particular GMs had discretion and independent judgment, particularly as to hiring and firing, but even as the total hours scheduled for their staff.  The GMs' experiences as to their relationship with their DMs varied, which shaped the level of discretion and independent judgment (or lack thereof) under which each GM operated.  Galba-Bright described having weekly conferences calls with his DM, her visiting his office every two weeks and being "micromanaged" by this particular DM since she was "more prescriptive".  D. 168-2 at 36.  Linda Gilroy indicated that if a decision needed to be made in her clinic, her DM was ultimately responsible.  D. 185-14 at 4.  Kevin Nelson observed that his DM was at the clinic often enough to know when there were issues.  D. 185-16 at 7.  Jacob Farnham communicated with his DM two to three times daily.  D. 185-19 at 4-5.  On the other hand, Heather Smith had a DM who would visit her clinic only once or twice a year and another who visited at least once a month.  D. 185-7 at 10-11.  Cardona and Clark both went for periods of time without a DM assigned to their office.  D. 171-3 at 15-16; D. 174-1 at 25-26.

The cases upon which Plaintiffs rely do not warrant a different outcome here. Plaintiffs point to Prinzo v. Hannaford Bros. Co., LLC, 343 F.R.D. 250 (D. Mass. 2023) and Lyons v. Citizens Fin. Grp., Inc., No. 11-11187-GAO, 2012 WL 5499878 (D. Mass. Nov. 9, 2012). In Prinzo, the court certified a class of managers, concluding that defendant's "corporate policies and procedures . . . constitute[d] sufficient common evidence to allow for class-wide adjudication." Prinzo, 343 F.R.D. at 253. The court there was "not persuaded" that the evidence submitted by defendant showing differences in job responsibilities among the managers was "sufficient to discount the probatory significance of the common evidence submitted by [plaintiff] or otherwise prevent class-wide adjudication." Id. In Lyons, the court similarly certified a class of assistant managers, concluding that "the factual determination of [an assistant manager's] primary duties can fairly and accurately be made generally for all [assistant managers]" and do not need to be made individually. Lyons, 2012 WL 5499878, at *2. Specifically, the court found that the job description and other internal documents treated assistant managers "as an identifiable class of employees as to whom the same policies and procedures are applied, including performance standards, training requirements, and various permissions and limitations applicable to [assistant managers] generally." Id. The court there was not persuaded by the affidavits of present and former assistant managers which spoke to differences and similarities in the duties of assistant managers because the affidavits were "conclusory and not of much value" and "d[id] not convincingly show that the primary duties are dissimilar." Id. Here, after a course of discovery including of 59 class members, the record discloses dissimilarity in the primary duty that GMs performed. The Court agrees with MyEyeDr's contention that given the evidence on this record attesting to differences in such duties, responsibilities and authority among GMs, individualized issues predominate and the Court cannot rely on the job description, standard operating procedures

and other Company materials to infer a common experience. See Rea v. Michaels Stores, Inc., No. 13-455-GW(AGRx), 2014 WL 1921754, at *3-4 (C.D. Cal. May 8, 2014) (concluding that even where there were "common issues, common policies, and . . . common requirements," the actual evidence submitted "demonstrate[d] that any class proceeding in this case would almost necessarily devolve into individual mini-trials regarding whether each particular class member actually met the requirements for exempt status"). These distinctions in the GMs' experiences do not lend themselves to a clear "yes" or "no" answer as to whether the GMs were misclassified as exempt. See DaRosa, 557 F. Supp. 3d at 323 (declining to certify a class of general managers). Accordingly, Plaintiffs have failed to establish predominance under Rule 23(b)(3).[9]

### C.    MyEyeDr's Motion to Decertify the FLSA Collectives

For substantially the same reasons, the Court allows MyEyeDr's motion to decertify the FLSA GM Collective. MyEyeDr's asserted defenses to Plaintiffs' FLSA claims, namely that Plaintiffs qualified for the executive and administrative exemptions, require individual-specific factual analyses and considerations. As noted, discovery revealed variations in the GMs' duties, independence and authority, so "the court cannot conclude that there is a consistent answer to the question whether the . . . opt-in plaintiffs were properly classified as exempt employees." DaRosa, 557 F. Supp. 3d at 322 (decertifying FLSA collective). As the court in DaRosa explained, "[a]ny fair adjudication would necessarily involve the specific circumstances of each GM's employment given the disparate employment experiences they report," which "would undermine the purpose of a collective action to streamline adjudication of the claims of class members." Id. at 322-23 (quoting Norceide v. Cambridge Health All., No. 10-11729-NMG, 2014 WL 775453, at *4 (D. Mass. Feb. 24, 2014)). Accordingly, the Court allows decertification of the FLSA GM Collective.

---

[9] Because Plaintiffs have failed to satisfy the requirements of predominance under Rule 23(b)(3), the Court need not address the remaining requirement of superiority.

Although the Court conditionally certified two FLSA collectives, MyEyeDr does not devote a lot of time to challenging the second collective, the FLSA GMIT Collective except as to ascertainability.   MyEyeDr contends that the GMIT collective is not "ascertainable" because no records exist that show which individuals served as GMITs and such determination would require "person-by-person analysis."  D. 211 at 20.  Plaintiffs counter that ascertainability is a Rule 23 class certification requirement and not a FLSA requirement, D. 231 at 25, and that MyEyeDr's failure to maintain records regarding same should not, in essence, be held against Plaintiffs.  Id. at n.24.  MyEyeDr relies upon Feustel v. Careerstaff Unlimited, Inc., No. 1:14-cv-264, 2015 WL 13021897 (S.D. Ohio Mar. 25, 2015), D. 235 at 18 for its argument.  The court in Feustel applied the fail-safe doctrine and concluded that "a fail-safe class is not of concern in a FLSA collective action 'where class membership is readily and objectively ascertainable on the basis of payroll records.'"  Feustel, 2015 WL 13021897, at *2 (citation omitted).  MyEyeDr does not appear to argue that the GMIT collective is a fail-safe class, and the Court does not find that it is, as the class is not "defined in terms of the legal injury," Nexium, 777 F.3d at 22, but instead in terms of whether a class member was a GMIT.  MyEyeDr's reliance upon Aquilino v. Home Depot, U.S.A., Inc., No. 04-04100-PGS, 2011 WL 564039, at *12 (D.N.J. Feb. 15, 20111), D. 235 at 18, is more apt where the court there declined to "create a subclass for [assistant store manager "ASM"] training" where it allowed decertification of the ASM collective.  Id. at *11-12.    "In light of the likelihood that an ASM training subclass would require an individualized determination of whether each Plaintiff was an executive during training, the Court declines to create such a subclass for all of the reasons previously expressed [as to the decertification of the ASM collective]."  Id. at *12.  So even if it is not clear that ascertainability requirement generally applies to typical FLSA collectives (even as the FLSA GMIT collective appears to be an atypical one in which membership in same

apparently cannot be determined by payroll records) as held in <u>Feustel</u>, the reasoning in <u>Aquilino</u> is persuasive. Where even after discovery, there appears to be no objective basis to conclude why this collective should include not only those who held the now phased-out position of GMIT as well as "GMs who were hired from outside of MyEyeDr, and spent a week or more in-store training," D. 42 at 5, as the Court conditionally certified on Plaintiffs' motion, the Court concludes, as MyEyeDr contends, that there is "an acute risk that the adjudication of the claims of the members of [this] collective will be derailed by factual disputes as to which individuals are included." D. 235 at 18 (citing <u>Aquilino</u>) (emphasis in original).

Accordingly, the Court also allows the motion to decertify the FLSA GMIT Collective as well.[10]

## D.    MyEyeDr's Motion to Exclude the Opinion of Plaintiffs' Expert

MyEyeDr moved to exclude Plaintiffs' proffered expert witness, Dr. Liesl M. Fox under Fed. R. Evid. 702 and 403. D. 208. Pursuant to Federal Rule of Evidence 702, an expert opinion is admissible if (1) "scientific, technical, or other specialized knowledge will help the trier of fact," (2) the expert is qualified "by knowledge, skill, experience, training, or education" to testify on that subject, (3) the expert's proposed testimony is based upon "sufficient facts or data," (4) that testimony is the product of "reliable principles and methods" and (5) the expert reliably applies "the principles and methods to the facts of the case." Fed. R. Evid. 702. MyEyeDr does not challenge Dr. Fox's credentials as a highly qualified, statistical consultant, D. 229-1 at 1, or the general relevance of her proffered opinions, but challenges the reliability of them on several grounds and posits that her proposed testimony would be unhelpful to the jury. D. 209 at 7-15.

---

[10] In light of the conclusions decertifying the collectives on the bases explained above, the Court does not reach MyEyeDr's alternative ground for decertification regarding the statute of limitations as applied to some class members. D. 211 at 16.

Relatedly, MyEyeDr asserts that her opinion should be, alternatively, excluded under Rule 403 since whatever limited probative value it may have will be outweighed by its unduly prejudicial effect and "its propensity to mislead and confuse the jury." D. 209 at 15.

As to reliability, MyEyeDr challenges Dr. Fox's opinions on several grounds. Since the Court concludes that at least two of them warrant exclusion of her opinions, the Court will focus its analysis there. First, the reliability of her opinions were undermined by assumptions made that were not supported by the record. As to the calculation of potential backpay, she assumed that all of the GMs' training last eight weeks when there was testimony from MyEyeDr's Chief Revenue Cycle Officer that such period could be shortened, D. 209 at 10 (citing deposition testimony), and two class members for which she had made such calculation, testified that neither undertook such training and others testified to a shorter training period. Id. (citing transcript). That Dr. Fox's calculation for backpay were premised on such unsupported assumptions undermines the reliability of same. See Rand A Tech. Corp. v. Parametric Tech. Corp., No 03-cv-11046-MEL, 2005 WL 6768210, at *1 (D. Mass. Oct. 19, 2005). Moreover, Plaintiffs' response that Dr. Fox's assumption is reasonable because MyEyeDr failed to keep records of its training periods for GMs, D. 229 at 19, only goes so far and does not explain how the static figure of eight weeks of training across the board was a reliable methodology to use here. Similarly, in her opinion regarding whether Plaintiffs supervised the equivalent of two full-time employees (for the purposes of determining if the executive exemption applied), she did not account for inventory hours spent by these employees "which artificially deflated the labor hours GMs supervised." D. 209 at 11. Plaintiffs respond that such omission is not material as it would not have changed the outcome of her analysis. D. 229 at 17. Such reply seems beside the point; the key is that there is no explanation of a reliable methodology in which she included some work hours in her analysis and excluded

others.   Earley Info Sci., Inc. v. Omega Engineering, Inc., 575 F. Supp. 3d 242, 247 (D. Mass. 2021) (excluding expert opinion given, among other things, his "exclusion of 25 specifications as out of scope is not supported by externally validated principles or methods, or at least he does not cite any"); see Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse Securities (USA) LLC, 752 F.3d 82, 96 (1st Cir. 2014) (affirming district court's exclusion of expert opinion noting that the "district court was not obligated to prune away all of the problematic events in order to preserve [the expert's] testimony" and the court "did not abuse its discretion in treating the entire event study as inadmissible given the overwhelming imbalance between unreliable and reliable dates").   Since both issues are at the core of the reliability of Dr. Fox's underlying methodology, the Court cannot say that such issues can be addressed with "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."   Early, 575 F. Supp. 3d at 249 (quoting Daubert, 509 U.S. at 596).   For at least these reasons, the Court concludes that Plaintiffs have not shown the reliability of Dr. Fox's methodology or the opinions that she has professed from its application here.

Relatedly, the Court questions that they will be helpful to the trier of fact.   Fed. R. Evid. 702;  Cipollone v. Yale Indus. Prods., Inc., 202 F.3d 376, 380 (1st Cir. 2000).   MyEyeDr argues that Dr. Fox's testimony would not assist the jury because Dr. Fox's calculations are basic math that a layperson can understand without the assistance of an expert.   D. 209 at 14.   "If a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury."   United States v. Navedo-Ramirez, 781 F.3d 563, 568 (1st Cir. 2015).   According to Plaintiffs, Dr. Fox's expert report provides calculations of Plaintiffs' average hourly rate of pay and damages that would be owed in backpay.   D. 229 at 7.   In addition, Dr. Fox determined whether

each GM supervised two full-time employees by reviewing payroll records and comparing crossover between GMs and non-exempt hourly employees. Id. As part of this analysis, "[i]f there were two or more hourly employees who worked during a work week supervised by a Discovery Plaintiff, and the total number of hours recorded for all hourly employees during the work week was 80 or more, then the location passed the [two full-time employees] rule for that work week." D. 229-2 at 20.

If MyEyeDr is found to have violated the FLSA, it would owe backpay for uncompensated overtime hours worked by GMs at a rate of one and a half times their hourly rate. Upon determining the number of overtime hours each GM worked, the jury would be tasked with calculating each individual's hourly rate by dividing the weekly salary by the number of hours worked that week. To calculate the backpay, the jury would (1) multiply the hourly rate by one and a half and (2) multiply that by the GM's overtime hours that given week. Such calculations constitute basic math that a jury can compute without the opinion of an expert. See Neelon v. Krueger, No. 12-cv-11198-IT, 2015 WL 12964643, at *2 (D. Mass. Sept. 2, 2015) (excluding expert's testimony regarding salary calculation because "the jury is equally able to complete the relatively simple calculation of 'hours worked x rate charged—overhead = income'"); Luck v. McMahon, No. 3:20-cv-00516 (VAB), 2022 WL 5500934, at *7 (D. Conn. Feb. 11, 2022) (excluding expert testimony regarding lost compensation and damages analysis because the expert opinion involved "straightforward mathematical calculations").

Plaintiffs note that the payroll data in this case "contains more than 95,400 rows of data" spanning five years with "81 different earnings code[s] some of which are included in the damage calculations and others that are not properly included in the regular rate," and "it contains unpaid and paid time off hours that need to be excluded from hours work estimates, and . . . bonuses that

need to be spread over the time periods during which they are earned." D. 229 at 10-11. They argue that, given the enormity of the data, a jury is unlikely to have the ability to do these calculations. Id. at 11. The court in <u>Golden Unicorn Enters., Inc. v. Audible, Inc.</u>, 682 F. Supp. 3d 368 (S.D.N.Y. 2023) rejected a similar argument. The court there excluded an expert's calculation of the individual plaintiffs' damages because it "involve[d] relatively simple arithmetic, not expert analysis." <u>Golden Unicorn Enters., Inc.</u>, 682 F. Supp. 3d at 379. The plaintiffs argued that "the jury cannot be expected to determine damages from [defendant's] raw data." Id. The court disagreed and reasoned that "Plaintiffs' counsel could create summary charts to present them to the jury," and "if Plaintiffs were to introduce evidence of class-wide damages . . . they could use Excel or another tool to do so." Id. at 379-80. The court concluded that "[t]he fact that there may be thousands of class members does not make the arithmetic more complicated or 'unwieldy.'" Id. at 380. The Court agrees that this proffered "opinion" does not require specialized knowledge or would be helpful to the jury as required under Fed. R. Civ. P. 702. Moreover, Plaintiffs may present such voluminous data (which they can choose to do so pursuant in summary form under Fed. R. Evid. 1006), explain the meaning of such numbers through lay witnesses and argue the reasonable inferences that can be drawn from same to the jury. Similarly, the total number of hours recorded for all hourly employees supervised by a class member also involves a mathematical calculations and argument that if this total totalled 80 hours or more, then that GM supervised two or more full-time employees. Such data can be presented in summary fashion to the jury and also does not require specialized knowledge.

Lastly, and not insignificantly, given the deficiencies addressed above, there is a risk that the jury will attach undue significance to this opinion offered by an expert, <u>United States v. Montas</u>, 41 F.3d 775, 784 (1st Cir. 1994) (noting that "[b]y appearing to put the expert's stamp of

approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged") such that any probative value of same is outweighed by the risk of undue prejudice and confusion to the jury under Rule 403.

Accordingly, the Court allows MyEyeDr's motion to exclude the opinion of Plaintiffs' expert, Dr. Fox, at trial.[11]

### E.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs moved for partial summary judgment on five matters:  1) whether Plaintiffs were exempt under FLSA's executive or administrative exemptions when they worked as GMITs; 2) whether Plaintiffs were exempt under FLSA's executive or administrative exemptions when MyEyeDr made partial day deductions; 3) whether an executive exemption applies where, as Plaintiffs contend, "at least 25% of Plaintiffs did not customarily and regularly direct the work of two or more employees"; 4) whether their salaries as GMs and GMITs was intended to compensate them for 45 hours of work per week; and 5) Plaintiffs' entitlement to liquidated damages.  D. 179 at 1-2.

#### 1.    *Executive and Administrative Exemption for GMITs*

Plaintiffs claim that MyEyeDr cannot satisfy the executive or administrative exemptions for GMITs.  D. 180 at 9-14.  MyEyeDr bears the burden of proving that the executive and administrative exemptions apply by establishing each prong of the respective tests.  Marzuq, 807 F.3d at 438; Walsh, 64 F.4th at 5.  Still, Plaintiffs have failed to show the absence of any disputed issue of material fact as to this matter.  As addressed in the analysis of the motion to decertify the FLSA GMIT Collective above, there remains a disputed issue at least as to the threshold issue of which Plaintiffs are even considered GMITs.  Accordingly, the Court cannot conclude that there

---

[11] Given the reasons for this ruling stated above, the Court does not address the other grounds for precluding the expert asserted by MyEyeDr.  D. 209 at 7-8, 10-11, 13-14.

is the absence of any undisputed issues of fact given this circumstance and denies Plaintiffs' motion as to the inapplicability of the executive and administrative exemptions to GMITs.

### 2.    *Salary Basis Test and Payroll Deductions*

Plaintiffs argue that MyEyeDr cannot meet the salary basis test under the executive and administrative exemptions because it "had an actual practice of making improper deductions from the salaries of GMs and GMITs." D. 180 at 15. An employee is paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). An employee "only loses salaried status if the employer has an actual practice of making improper deductions." Holden v. Cenpatico Behavioral Health, LLC, 347 F. Supp. 3d 77, 87 (D. Mass. 2017). "Improper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions." 29 C.F.R. § 541.603(c). Additionally, "[i]f an employer has a clearly communicated policy that prohibits the improper pay deductions . . . and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints." 29 C.F.R. § 541.603(d).

Jessica Jacobs ("Jacobs"), MyEyeDr's senior payroll manager, testified that the deductions were "not an intentional omission of payment" and that "it was not the process to intentionally not pay employees." D. 181-5 at 18-19. She explained that the "salaried unpaid time off" code was to be used in certain circumstances, such as intermittent leave. Id. at 19. Jacobs further explained that when an employee used the code, the payroll department did not need to approve or take any

action because the process was automatic, or as she describes it, "a systemic feed." Id. at 20. Upon discovering this misuse of the code, MyEyeDr conducted an audit through which it identified instances of improper partial day deductions and then reimbursed those plaintiffs whose wages had been improperly deducted. D. 190-11 at 10-12; D. 190-12; D. 190-13. According to Jacobs, MyEyeDr adjusted its payroll practice to eliminate improper partial day deductions. D. 190-11 at 7. This corrective conduct fits within the exception to the loss of exemption. See 29 C.F.R. § 541.603(c). In addition, MyEyeDr's employee handbook provides:

> **Deductions from Exempt Associate Wages.** Subject to exceptions listed below, an exempt Associate must receive the full salary for any workweek in which the Associate performs any work, regardless of the number of days or hours worked. If the employer makes deductions from an Associate's predetermined salary, i.e., because of the operating requirements of the business, that Associate is not paid on a "salary basis." . . .
>
> If you have any questions about the deductions taken from your paycheck, or you believe that a deduction has been taken in error, please contact the Vice President Human Resources or the CFO. If an improper deduction has occurred, you will be reimbursed.

D. 174-16 at 55 (emphasis in original). This written policy prohibiting improper pay deductions also fits within the exceptions to loss of exemption. 29 C.F.R. § 541.603(d). Given these circumstances, MyEyeDr has shown a dispute of material fact as to whether it had an actual practice of making improper deductions from GMs' pay. Accordingly, the Court denies summary judgment to Plaintiffs on this issue.

### 3.    Customarily and Regularly Supervise Two or More Employees

Plaintiffs also seek summary judgment on behalf of fifteen Plaintiffs because, they argue, MyEyeDr cannot show that these Plaintiffs customarily and regularly directed the work of two or more employees under the executive exemption test. D. 180 at 19-21. Again, Plaintiffs rely upon the opinion of their expert, Dr. Fox, who compared payroll data of the discovery plaintiffs and hourly employees who worked in their stores and found that fifteen of the discovery plaintiffs

failed to supervise the equivalent of two full-time employees at least 80% of their workweeks. D. 180 at 20-21. Even as the Court has excluded Plaintiffs' expert, the underlying data upon which Dr. Fox relied may still be presented to the jury so the Court has considered Plaintiff's argument as to this matter with that in mind. There, however, still remain disputed issues of fact as to whether these Plaintiffs customarily and regularly directed the work of two or more employees where there is conflicting evidence in the record about the number of employees that some of them supervised and whether the sum of those labor hours amounts to two full-time employees or the equivalent of same. D. 189 at 10-13. Accordingly, the Court denies Plaintiffs' motion for summary judgment on this issue.

### 4.    *Liquidated Damages*

Plaintiffs contend that they should be awarded liquidated damages. D. 180 at 24-25; 29 U.S.C. § 216(b). Because the Court has not determined that MyEyeDr violated the FLSA, the Plaintiffs' request for a ruling on their entitlement to liquidated damages is premature. Lemieux v. City of Holyoke, 740 F. Supp. 2d 246, 258 (D. Mass. 2010) (denying plaintiffs' motion for partial summary on the issue of liquidated damages because no determination on the issue of defendants' violation of the FLSA had been made and thus a decision on liquidated damages was premature). Accordingly, the Court denies the motion as to liquidated damages.

### 5.    *Calculating Regular Rate*

Under the FLSA, employers must compensate employees for overtime at one and one-half times the employee's regular rate. "An employee's 'regular rate' refers to 'the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed.'" Marcus v. Am. Cont. Bridge League, Inc., No. 17-11165-FDS, 2021 WL 1132161, at *34 (D. Mass. Mar. 24, 2021) (Marcus II) (quoting Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)), aff'd in part, rev'd in part, 80 F.4th 33 (1st Cir. 2023). In calculating the "regular rate,"

courts can employ the fixed weekly salary method or the fluctuating workweek method.  Id. Plaintiffs argue that the fixed weekly salary method should apply and that was intended to compensate them for 45 hours per week.  See D. 180 at 22-24.  Although MyEyeDr contends that there are factual disputes on this issue and the record does not support Plaintiffs, the Court declines to grant summary judgment to Plaintiffs on this issue because it pertains to the measure of damages, a subject that is premature given the remaining issues of material fact relating to whether MyEyeDr is liable to any Plaintiff.

**F.    MyEyeDr's Motion for Summary Judgment as to Galba-Bright**

MyEyeDr contends that Galba-Bright is exempt under the executive exemption.  D. 167 at 1.  The parties do not dispute that Galba-Bright supervised more than two full-time employees.  D. 168 ¶ 34; D. 194 ¶ 34.   Although Galba-Bright suggests that "[t]here are material facts in dispute that [MyEyeDr] cannot meet the requirements of the salary basis test" due to MyEyeDr's alleged practice of salary deductions, D. 193 at 9 n.1, there is no evidence that Galba-Bright's salary was reduced by any such deductions.  See D. 195-3 at 96).  There is otherwise no dispute that Galba-Bright's weekly salary exceeded $684 per week.  See D. 168 ¶ 57; D. 194 ¶ 57.  The Court thus turns to the second and fourth factors of the executive exemption test.

> 1.    *Management as Primary Duty*
>
> > a)    Relative importance of Galba-Bright's exempt duties as compared with other duties

Galba-Bright performed both managerial and non-managerial duties.  Galba-Bright assisted patients by scheduling appointments, answering phones, making sales, verifying insurance and setting up product displays.  D. 168-2 at 25, 45.  Galba-Bright, however, also was responsible for associate development, id. at 14, including training other GMs, id. at 13, coaching associates, id. at 14, evaluating associate performance and providing feedback, id. at 23-24.  He was also

tasked with monitoring the financial performance of his clinic, id. at 14, maintaining sales targets, id. at 22, managing inventory, sales and staffing, id., among other things. Galba-Bright placed orders for supplies and resolved patient issues when "something went sideways" or patients were being "a little difficult." Id. at 25.

Here, as in Marzuq, "[t]he record contains evidence that [plaintiff's] managerial and non-managerial duties were both essential for the smooth functioning of their [business]." Marzuq, 807 F.3d at 440. Galba-Bright testified that he spent 70% of his time on "patient interaction." D. 168-2 at 45. Galba-Bright testified that on any given day, if the clinic was "backed up with patients" and he could not find other coverage, he would assist the eyewear consultants by "assum[ing] that role" while "waiting for assistance." Id. at 25. Likewise, "[d]epending on what was going on with the laboratory and coverage," if there was no one to process orders, Galba-Bright "would generally process orders so that everybody that [they] had available to take care of patients and optical or pretesting could do that" without having to "pull[] a stronger salesperson off the board" for that coverage. Id. He further testified that, "depending on how busy things were," he might "assist with cleaning orders and setting orders for patients." Id. When the day was busy and required him to prioritize non-managerial duties during the workday, Galba-Bright would have to set aside time after closing to perform the managerial tasks. See id. at 25, 40-41. Galba-Bright testified that sometimes he would have to leave tasks such as inventory until after closing because it was "difficult to not pay attention to what was going on on the optical board and try to get things done." Id. at 26.

"If, contrary to their job descriptions, managers could not prioritize their supervisory duties because 'quality Customer Service' demanded that they regularly perform tasks ordinarily assigned to hourly employees, a factfinder could reasonably conclude that plaintiffs' exempt and

nonexempt duties were equally important." <u>Marzuq</u>, 807 F.3d at 441.  Here, the record evidence shows that Galba-Bright spent most of his day performing non-exempt work and sometimes had to reprioritize his managerial duties to assist with non-exempt tasks.  <u>See</u> <u>Roberts</u>, 2017 WL 1217116, at *10 (finding factual dispute existed as to the relative importance of exempt duties where, among other things, the plaintiffs testified that "there were times when they prioritized their non-managerial duties over their managerial ones," thus suggesting that "their managerial tasks might not have been more important if other duties set by the employer forced them to sometimes prioritize their non-managerial tasks").  Here, "whether the 'relative importance' of duties factor supports the overtime exemption cannot be determined without a factfinder's judgment on the impact of the plaintiff['s] varied undertakings." <u>Marzuq</u>, 807 F.3d at 441.

### b)    Amount of time spent on exempt work

Galba-Bright testified that he spends 70% on "patient interaction," i.e., non-exempt duties. D. 168-2 at 45.  An employee, however, "can still be 'managing' if [he] is in charge, even while physically doing something else." <u>Donovan v. Burger King Corp.</u>, 672 F.2d 221, 226-227 (1st Cir. 1982).  Galba-Bright acknowledged that he was responsible for what was going on in the office each day, and if an issue came up while he was working with a patient, he was responsible for addressing it.  D. 168-2 at 26, 46.  A factfinder could find that by working alongside the associates, Galba-Bright could concurrently perform some of his managerial duties, such as "coaching them and correcting their mistakes." <u>Marzuq</u>, 807 F.3d at 442.  The record, however, "contains evidence indicating that [Galba-Bright's] supervisory role was, at least at times, overwhelmed by his non-managerial tasks." <u>Id.</u>  "[G]iven the competing demands routinely placed on [Galba-Bright], a factual dispute exists as to how much of his workweek he actually was 'in charge' of the store." <u>Marzuq</u>, 807 F.3d at 442; <u>see</u> <u>Roberts</u>, 2017 WL 1217116, at *9 (concluding that disputes as to "how much time the Plaintiffs spent on exempt work and . . . whether they

performed exempt and nonexempt duties simultaneously . . . preclude finding that the amount of time factor conclusively weighs in either side's favor").

c)   <u>Freedom from direct supervision</u>

There is some evidence to suggest that Galba-Bright was not operating "without a supervisor looking over [his] shoulder, monitoring [his] every move." <u>Thomas</u>, 506 F.3d at 507. Although his DMs visited approximately once every ten to fourteen days, D. 168-2 at 35-36, Galba-Bright described being "micromanaged" by one DM and observed that "everything tightened up more" when she became his DM because she was "more prescriptive." <u>Id.</u> at 36. At one point during his tenure, Galba-Bright was required to send a daily recap to his DM at the end of every night with an overview of the day and the business outcomes. <u>Id.</u> at 32. Based on these facts, a jury could conclude that he was not relatively free of direct supervision. <u>Cf.</u> <u>Thomas</u>, 506 F.3d at 507 (concluding plaintiff was relatively free from supervision because her DM's "oversight," namely the "weekly visits, frequent calls and emails, [and] constant availability" did not "negate a finding that [she] operates free from supervision when the district manager is absent").

Galba-Bright had "some autonomy over the day-to-day operation" of his clinic but was "unable to make any significant or substantial decisions on [his] own." <u>Marzuq</u>, 807 F.3d at 443 (internal quotation marks omitted) (quoting <u>Donovan</u>, 672 F.2d at 227). There were, however, limits to Galba-Bright's authority. He did not have the authority to terminate employees, D. 168 ¶ 47; D. 194 ¶ 78; D. 214 ¶ 78, nor did he have the authority to issue formal written warnings to employees without permission or involvement from his DM, D. 168-2 at 30. For other examples, if the clinic needed maintenance work, he could not hire a repair person and would have to submit a request to MyEyeDr, <u>id.</u> at 44, and as a general matter, he could not deviate from corporate policies and was expected to follow the company's standard operating procedures. <u>Id.</u> at 45.

48

         d)      <u>The relationship between Galba-Bright's salary and the wages paid to hourly employees for similar nonexempt work</u>

As noted in the analysis regarding the class certification motion, there is disputed evidence about the differential between the overall average for GM and GMITs versus non-exempt, hourly employees.

Given the balance of the other factors bearing upon whether Galba-Bright's primary duty was management, the Court concludes that his "primary duty cannot be determined as a matter of law at this stage of the case." <u>Marzuq</u>, 807 F.3d at 447.

       *2.    Authority to Hire or Terminate*

Although the Court need not reach this factor given the factual dispute as to Galba-Bright's primary duty, the Court will do so for completeness. As noted, Galba-Bright did not have the authority to terminate an employee. D. 168 ¶ 47; D. 194 ¶ 78; D. 214 ¶ 78. MyEyeDr, however, contends that on two occasions, Galba-Bright "recommended to HR that an associate be terminated for attendance issues," both of which HR approved. D. 167 at 20. Galba-Bright denies that he "recommended termination" and simply "sought permission to terminate them" since the employees had not shown up to work, thus abandoning the job. D. 194 ¶ 49; D. 168-11 at 2. Galba-Bright also disputes that he had any authority to hire while employed as a GM. D. 194 ¶ 43. At some point during his employment at MyEyeDr, Galba-Bright was able to make hiring decisions. D. 168-2 at 19. It is unclear from the record, however, whether Galba-Bright's ability to make hiring decisions was limited to his tenure as a DM or whether he retained hiring authority even after being demoted to GM. <u>See</u> D. 194 ¶ 43; D. 168-2 at 19.

Because MyEyeDr has failed to show that no genuine dispute exists as to this factor, the Court denies the motion for summary judgment as to Galba-Bright.

### G.  MyEyeDr's Motion for Summary Judgment as to Cardona

MyEyeDr contends that Cardona is exempt from the overtime requirements of the FLSA under the executive or administrative exemptions.  D. 169 at 1.

### 1.  *Executive Exemption*

As to the first factor, Cardona claims that "[t]here are material facts in dispute that [MyEyeDr] cannot meet the requirements of the salary basis test" due to MyEyeDr's alleged practice of salary deductions.  D. 203 at 12 n.1.  Cardona, however, has not provided evidence that his salary was reduced by any such deductions.  See D. 205-5 at 96.  There is otherwise no dispute that Cardona's weekly salary exceeded $684 per week.  See D. 171 ¶ 67; D. 204 ¶ 67.

As to the third factor of the executive exemption test, Cardona disputes that he "customarily and regularly directs the work of two or more other employees."  29 C.F.R. § 541.100(a)(3).  Even as he relies upon (at least the first of) Dr. Fox's (now struck) reports for the contention that he did not supervise the equivalent of at least two full-time employees, D. 204 ¶ 36; but see D. 205-5 at 93 (concluding, in Dr. Fox's supplemental report, that Cardona supervised the equivalent of two full-time employees 100% of the time), Cardona also testified that "for every week of [his] employment as a general manager, [he's] had at least two full-time employees working in" the clinic, D. 171-3 at 36.

Even if the Court concludes that the evidence as to these two factors is undisputed, the factual record at least as to the second factor of the executive exemption test remains disputed.

### a)  Management as Primary Duty

#### (1)  Relative importance of Cardona's exempt duties as compared with other duties

Cardona performs both managerial and non-managerial duties.  Cardona, for instance, checks patients in and out, answers phones, schedules appointments, verifies insurance, checks in

contact lens orders and sells eyeglasses and contact lenses. D. 205-2 ¶ 2. As to his managerial duties, Cardona was responsible for monitoring his team's performance and providing consistent coaching, feedback and mentoring on improving the patient experience and driving patient loyalty. D. 171 ¶¶ 37, 40; D. 204 ¶¶ 37, 40. He also prepares and delivers performance reviews for his team, D. 171 ¶ 43; D. 204 ¶ 43, and schedules employees at least for the hours allotted to him to do so. D. 171 ¶ 46; D. 204 ¶ 46.

There is evidence in the record that suggests that both Cardona's managerial duties and his non-exempt tasks were critical to the success of the clinic. Cardona declares that he spent the bulk of his time, specifically 85% of it, checking in patients, answering phones, scheduling appointments, verifying insurance and the like, i.e., non-exempt tasks. D. 205-2 ¶ 2. At least for some time, Cardona had to assume the technician role on Mondays due to staffing needs. D. 204 ¶ 75; D. 218 ¶ 75. He testified needing to fill the technician position so that he could "do [his] job." D. 171-3 at 12. Cardona also testified that given the scheduling restraints, namely the hour allocation limit, he had to let his teammates go home early and "pick that slack up" himself. D. 171-3 at 11. To some extent, Cardona had to sometimes reprioritize his own managerial duties to assist in the operation of the clinic, which could lead a factfinder to "reasonably conclude that [his] exempt and nonexempt duties were equally important." Marzuq, 807 F.3d at 441.

Accordingly, the question of the relative importance of Cardona's exempt duties is best left for a factfinder.

(2)    Amount of time spent on exempt work

Although Cardona testified that he spent 85% of his time performing non-exempt work, D. 205-2 ¶ 2, there is also evidence to suggest that he concurrently performed managerial duties. Specifically, Cardona described that he spends the majority of his time at the front desk, which "allows [him] to get what [he] need[s] to get done, and it also allows [him] to observe the floor

and . . . the front desk." D. 171-3 at 25. Cardona disputes that this testimony states that he was simultaneously performing managerial tasks. D. 204 ¶ 24. While "get[ing] what [he] need[s] to get done" implies the performance of managerial tasks given his role as GM, a factual dispute exists as to what these tasks involved and whether they were managerial in nature. Cardona, however, described that while working at the front desk, if he observed that an EC failed to maximize a sales opportunity, he would provide "in-the-moment coaching." D. 171-3 at 26. Cardona further testified that if he was at the front desk doing something else but noticed a patient interaction that was not going well, he addressed it with the team member. D. 171-3 at 27.

Moreover, it appears disputed that Cardona could always concurrently supervise his staff and perform non-exempt tasks. Cf. Hamel, 2021 WL 3516449, at *6 (describing a factual dispute regarding whether plaintiff was always able to perform non-exempt tasks and exempt duties concurrently where plaintiff submitted an affidavit stating that he could not always do so). There is, however, some evidence in the record "indicating that [Cardona's] supervisory role was, at least at times, overwhelmed by his non-managerial tasks," Marzuq, 807 F.3d at 442, where on several occasions Cardona had to assume other roles due to staffing constraints. Given the factual disputes as to how often and to what extent Cardona was able to concurrently perform exempt and non-exempt tasks, at this stage, the Court cannot conclude that this factor weighs in either direction.

(3)    Freedom from direct supervision

There is some evidence to suggest that Cardona was operating with freedom from supervision. For instance, neither of his DMs regularly worked from the clinic and typically visited only once a week. D. 171 ¶ 18; D. 204 ¶ 18. Aside from those weekly visits, Cardona was expected to share his KPIs with his DM every day by midday, D. 171-3 at 28, participate in weekly calls with his DM and other GMs, id. at 15, and participate in monthly meetings with his DM to discuss the clinic's Profit and Loss ("P&L") statements, id. at 34. Such level of engagement with his DM

does not necessarily indicate a lack of freedom from supervision.  See Thomas, 506 F.3d at 506-07 (explaining that "active supervision and periodic visits by a [district] manager do not eliminate the day-to-day discretion of the on-site store manager") (alteration in original) (quoting Murray, 50 F.3d at 570).  During a gap when Cardona was between DMs, a DM was assigned to fill in but Cardona never received "any kind of communication" from her, suggesting a lack of direct supervision at least for some period.[12]  D. 171-3 at 15-16.

The record, however, also shows limits to Cardona's freedom to make significant or substantial decisions on his own.  For instance, when scheduling, Cardona had discretion in how he allocated hours among his staff, D. 171-3 at 24, but he was required to stay within the limits of the budgeted hours for his clinic, D. 171-3 at 10-12, and he did need approval to schedule employees in excess of the clinic's allotted hours.  D. 171-3 at 22-23.  Cardona indicated that to meet the staffing needs of the clinic, he needed an increase in the hour allocation, and despite requests for same, he was told to stay within the limits of the budgeted hours.  Id.  Although Cardona testified that he had gone "a little over [his] hours every week" when scheduling, D. 171-3 at 21, going over the allotted hours affected his metrics on his performance review.  D. 171-3 at 23-24.

Cardona was also restricted in other ways.  For instance, although Cardona prepared performance reviews for his team, he was required to submit them to his DM for review and approval.  D. 171-3 at 30; D. 204 ¶ 90; D. 218 ¶ 90.  Cardona was involved in the hiring process, but the decision of whether to hire any given candidate was ultimately "up to the district manager." D. 171-3 at 28; D. 204 ¶ 89; D. 218 ¶ 89.  Although Cardona could have informal conversations

---

[12] Although Cardona suggests that another GM, Megan, stepped into the DM role during that period, see D. 204 ¶ 21, the deposition testimony only reflects that Megan shared metric numbers during the weekly calls with all GMs and did not do physical visits.  D. 171-3 at 16.

with staff regarding performance issues, he was expected to involve HR for formal disciplinary action against an employee.  D. 171-3 at 32-34; D. 204 ¶ 92; D. 218 ¶ 92.  When the store needed an associate, Cardona had to put in a requisition for help.  D. 204 ¶ 82; D. 218 ¶ 82.

On this record, there remains a factual dispute about this factor.

> (4)    The relationship between Cardona's salary and the wages paid to hourly employees for similar nonexempt work

MyEyeDr analyzes this factor under the Fourth Circuit's "profit center" framework, see D. 170 at 12-13 (citing cases), which, as previously indicated, has not been adopted in this circuit. MyEyeDr does not otherwise compare the relationship between Cardona's salary and that of hourly employees and, as discussed above, to the extent that Plaintiffs offered any evidence regarding this matter in the Dr. Fox's report, a factual dispute remains as to this factor.

Since no primary duty factor weighs conclusively in favor of MyEyeDr, at this stage, the Court cannot determine that Cardona's primary duty was management.  Accordingly, the Court denies the motion as to the executive exemption.[13]

### 2.    *Administrative Exemption*

As discussed under the executive exemption analysis, there is no genuine dispute that Cardona's salary was at least $684 per week.  The Court thus turns to the second factor of the administrative exemption test.

> a)    <u>Work Directly Related to Management or Business Operations as Primary Duty</u>

MyEyeDr is in the business of "provid[ing] eye care and eyewear to patients."  D. 171 ¶ 1; D. 204 ¶ 1.  Cardona claims that he spent 85% of his workdays checking patients in and out, answering phones, scheduling appointments, verifying insurance, checking in contact lens orders

---

[13] Given the factual dispute as to Cardona's primary duty, the Court need not reach the fourth factor.

and making sales of eyeglasses and contact lenses. D. 204 ¶ 74; D. 218 ¶ 74. These duties, namely assisting patients in receiving optical services and selling eyewear, are the very product and service that MyEyeDr is in the business of providing. MyEyeDr does not dispute that Cardona performed these tasks, D. 218 ¶ 74(a)-(b), but disputes that 85% accurately describes the amount of time Cardona spent on such tasks and notes that Cardona described having other responsibilities, "including ensuring that his clinic hit its goals; maximizing profitability; monitoring staff performance and providing consistent coaching, training, feedback, and mentoring; scheduling employees; interviewing candidates and making hiring recommendations; and addressing misconduct." D. 218 ¶ 74(c). Even accepting MyEyeDr's characterization of Cardona's primary duties, a reasonable factfinder could conclude that these additional duties, like those of the directors in Marcus II, are related to producing MyEyeDr's business purpose of providing eye care and eyewear to patients. See Marcus II, 80 F.4th at 47-48. For instance, ensuring that the clinic hits its sales goals and training and coaching associates on maximizing eyeglass sales directly relate to MyEyeDr's business function of selling eyewear. Cardona was also eligible for additional compensation based on the financial performance of his clinic, D. 204 ¶ 68, and his performance review was based on the clinic's financial metrics, see D. 171-3 at 21. Given that sales performance was "central to how [MyEyeDr] evaluate[d] the job performance of [Cardona]," a factfinder might conclude that MyEyeDr employed Cardona with the specific purpose of selling its product. Su, 677 F. Supp. 3d at 20-21 (concluding that defendant employer did not meet the second prong of the administrative exemption test because its business purpose was to sell its products, and it employed its sales representatives to sell those products, as indicated, in part, by the fact that job performance was based on sales performance).

55

Because MyEyeDr has not shown that no genuine dispute of fact exists as to the second factor, the Court denies the motion as to the administrative exemption.[14]

**H.    MyEyeDr's Motion for Summary Judgment as to Clark**

MyEyeDr has moved for summary judgment as to all claims brought by Clark, contending that she qualifies as exempt under the executive exemption. D. 173 at 1.

*1.    Executive Exemption*

First, Clark claims that "[t]here are material facts in dispute that [MyEyeDr] cannot meet the requirements of the salary basis test" due to MyEyeDr's alleged practice of salary deductions. D. 199 at 15 n.3. Clark, however, has not provided evidence that her salary was reduced by any such deductions. See D. 201-5 at 96. There is otherwise no dispute that Clark's weekly salary exceeded $684 per week. See D. 174 ¶ 48; D. 200 ¶ 48. The Court thus turns to the second factor of the executive exemption analysis.

a)    Management as Primary Duty

(1)    Relative importance of Clark's exempt duties as compared with other duties

Clark performed both managerial and non-managerial duties. In terms of her managerial duties, Clark was responsible for scheduling the employees who worked in her clinic and ensuring that the clinic was appropriately staffed, which included finding coverage for associates as needed. D. 174 ¶ 34; D. 200 ¶ 34. Clark also did some interviewing of candidates for hire. D. 174 ¶ 36; D. 200 ¶ 36. She was responsible for onboarding new hires at her clinic and for managing the profits and losses of the store. D. 174 ¶¶ 21, 38; D. 200 ¶¶ 21, 38. Clark indicated that she closely monitored the supply budget by being "conscientious about the money [she] spent on supplies,"

---

[14] Accordingly, the Court need not reach the third factor concerning Cardona's discretion and independent judgment.

understanding that "spending was important for profitability of the clinic." D. 174-1 at 42-43. Clark also on at least one occasion provided input on the budgeting process by completing a questionnaire, where she, among other things, proposed certain metric goals for her clinic. D. 174-1 at 42-44; D. 174-12. As to her nonexempt duties, Clark sold glasses and contacts, filled appointments, answered phones, pulled insurance, checked in patients, dispensed glasses, cleaned and stocked. D. 200 ¶¶ 63, 72; D. 216 ¶¶ 63, 72.

The record evidence shows that Clark's managerial and non-managerial duties were both essential for the smooth functioning of the clinic. Clark testified that she spent 75% of her time performing nonexempt tasks (i.e., selling glasses and contacts), and she believed that work to be "the most important part of her job." D. 174-1 at 52. Although Clark was required to provide regular feedback to associates on their performance, she testified that she could not do so because she rarely had time. Id. at 38. She noted that she "wasn't able to do general manager tasks because [she] was doing the [work of EC and PSC] and just general cleaning, stocking." Id. at 42. She was not able to provide the necessary training to fill gaps due to time constraints. Id. at 45. According to Clark, she "wasn't given much of an opportunity to actually manage" because "[w]orking in all departments, answering phones, pulling insurances, selling glasses . . . just took up much more of [her] time than manager-specific duties." Id. at 50-51. Based on this testimony, "a factfinder could reasonably conclude that [Clark's] exempt and nonexempt duties were equally important" given that she "could not prioritize [her] supervisory duties." Marzuq, 807 F.3d at 441; Roberts, 2017 WL 1217116, at *10.

(2)    Amount of time spent on exempt work

Clark testified that she spends 75% of her time performing non-exempt duties. D. 174-1 at 52. Clark spent most of her time on the sales floor, and she confirmed that even if she was helping a customer, she could see what the other folks on the sales floor were doing. D. 174-1 at

40.  She testified that, while on the sales floor, if she observed an associate doing something that they should not be doing, she could correct them even if not immediately "if [she] was with a patient."  D. 174-1 at 53.  The evidence thus suggests that even though Clark spent most of her time doing nonexempt work, she could, at least sometimes, concurrently perform her managerial duties, but sometimes was overwhelmed by non-managerial tasks.  Marzuq, 807 F.3d at 442.  Accordingly, a factual dispute remains.

(3)    Freedom from direct supervision

There is some suggestion that Clark was operating with freedom from supervision at least during some periods.  From December 2020 until February 2021, Clark did not have an assigned DM and ran her clinic without a direct supervisor, D. 174 ¶ 14; D. 200 ¶ 14, even as there were more senior GMs she could contact, D. 174-1 at 25-26.  When she did have a DM, they sometimes visited the store, D. 174 ¶ 17; D. 200 ¶¶ 17, 93; D. 216 ¶ 93 and communicated with Clark daily via Teams chat, phone calls, email or text message.  D. 200 ¶¶ 94-95; D. 216 ¶¶ 94-95.  This level of engagement from Clark's DM does not necessarily amount to lack of freedom from supervision.  See Thomas, 506 F.3d at 506-07.

The record, however, also shows limits to Clark's freedom to make decisions on her own.  For instance, when scheduling, Clark had discretion in how she allocated hours among her staff, but she was required to stay within the limits of the hours allotted for her clinic.  D. 200 ¶¶ 79-80; D. 216 ¶¶ 79-80.  Her DM monitored the payroll for Clark's store to ensure that Clark stayed within those allotted hours.  D. 200 ¶ 81; D. 216 ¶ 81.  If there was a maintenance issue in the clinic, Clark could not hire a repair person.  D. 200 ¶ 83; D. 216 ¶ 83.  She could not hire, discipline or terminate an employee without approval from her DM and could not implement her own promotions to boost sales.  D. 200 ¶¶ 76, 104, 106, 108; D. 216 ¶¶ 76, 104, 106, 108.

Given this record, the factual basis as to this factor remains contested.

58

> (4)    The relationship between Clark's salary and the wages paid to hourly employees for similar nonexempt work

MyEyeDr analyzes this factor under the Fourth Circuit's "profit center" framework and does not otherwise compare the relationship between Clark's salary and that of hourly employees. D. 173 at 12-13. For the same reasons articulated above, the Court cannot resolve this matter now as a matter of law.

Given the disputed record summarized above, the Court denies the motion as to the executive exemption.[15]

### 2.    FLSA's Emergency Exception

MyEyeDr argues that Clark's exemption status is protected under the FLSA's emergency exception. D. 173 at 18. The DOL regulations provide that "[a]n exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency." 29 C.F.R. § 541.706(a). Clark does not dispute that the COVID-19 pandemic was an emergency within the meaning of 29 C.F.R. § 541.706. D. 199 at 22. She argues, however, that issues of material fact remains as to the duration of the emergency. Id. at 22-23. Although the Court has already concluded that the factual basis for Clark's exempt status remains disputed, the Court reaches this emergency exception argument in the interest of completeness.

MyEyeDr contends that "[t]he entirety of [Clark's] employment took place during the heightened period of the COVID-19 pandemic, during which MyEyeDr. faced such unusually high staffing shortages and other challenges." D. 173 at 20. Clark began working at MyEyeDr in October 2020, D. 174 ¶ 6; D. 200 ¶ 6, after the COVID-19 pandemic had been underway. In response to the pandemic, MyEyeDr temporarily closed its clinics in the spring of 2020 and began

---

[15] Given the factual dispute as to Clark's primary duty, the Court need not reach the remaining factors as to the executive exemption.

gradually reopening in waves starting May 2020, five months prior to Clark starting at the company. D. 174 ¶ 55; D. 200 ¶ 55. Clark worked at MyEyeDr until June 2021. D. 174 ¶ 6; D. 200 ¶ 6.

Accordingly, the Court concludes that while the COVID-19 pandemic, at least at the start, was an emergency under 29 C.F.R. § 541.706, an issue of material fact exists as to whether such emergency remained by the start of Clark's employment, and, if it was, at what point during the course of Clark's employment the COVID-19 pandemic stopped being an emergency. See Crayton v. Sailormen, Inc., No. 2:22-cv-4, 2023 WL 4706168, at *5-7 (S.D. Ga. July 24, 2023) (concluding that the COVID-19 pandemic qualified as an emergency, "at least at the start," but that "a genuine issue of material fact exist[ed] as to how long the 'emergency' lasted" for the purposes of protecting plaintiff's exempt status). The Court thus denies summary judgment to MyEyeDr on this issue.

### 3. Massachusetts Trainee Exemption

MyEyeDr also contends that, under Massachusetts law, Clark was properly classified as exempt during her training period. D. 173 at 17. In Massachusetts, a "qualified trainee" for a bona fide executive or administrative position is exempt from Massachusetts overtime requirements. Mass. Gen. L. c. 151, § 1A(3).

Even putting aside Clark's legal arguments in opposition, D. 199 at 24-25, MyEyeDr, who bears the burden of showing that the exemption applies, Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 170 (2000) has not persuaded the Court that the Court can resolve this issue on the present, disputed record. D. 173 at 17. The Court interprets the exemption as requiring: (1) that Clark be a qualified trainee; (2) that she be training for a bona fide executive or administrative position; and (3) earning more than $80 per week. Mass. Gen. L. c. 151, § 1A(3). Because a factual dispute exists as to the second factor, namely whether the GM role is an executive or administrative

position, the Court cannot conclude on this disputed record that Clark was properly classified as exempt during her training period.  Accordingly, the Court denies the motion on this issue.

I.    **MyEyeDr's Motion for Summary Judgment as to Firouzi**

MyEyeDr argues that Firouzi's claims are time-barred and the default, two-year statute of limitations cannot be extended because Firouzi cannot show that MyEyeDr willfully violated the FLSA.  D. 176 at 1.  Pursuant to the FLSA, employees can seek recovery for back wages within two years of a cause of action accruing.  29 U.S.C. § 255(a).  If the employer's violation of the FLSA is willful, however, employees may seek recovery within three years of the cause of action accruing.  Id.  An employer willfully violates the FLSA when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  Firouzi bears the burden of showing that MyEyeDr acted willfully.  Cruz v. Bos. Litig. Sols., No. 13-11127-LTS, 2016 WL 3568254, at *10 (D. Mass. May 24, 2016).

"Courts typically examine a number of factors to determine whether an employer's behavior evinces knowledge or reckless disregard as to purported FLSA violations.  For example, an employer's 'failure to keep adequate payroll records,' 'intentional manipulation of [its] records,' and practice of paying employees 'off the books' could be 'sufficient grounds for concluding that [the employer] did not act in good faith or with a reasonable belief that it was in compliance with the FLSA.'"  Pineda v. Skinner Servs., Inc., No. 16-12217-FDS, 2020 WL 5775160, at *12 (D. Mass. Sept. 28, 2020) (alterations in original) (quoting Chao v. Hotel Oasis, Inc., 493 F.3d 26, 35 (1st Cir. 2007)) (collecting cases).  "Other indicia of willfulness include lack of diligence in researching FLSA requirements and ignoring repeated employee complaints about violations."  Id.  (collecting cases).

61

Firouzi provides no evidence that MyEyeDr ignored employee complaints of FLSA misclassification or underpayment, that MyEyeDr was subject to any DOL investigation or other litigation for its compensation practices or that MyEyeDr acted deceitfully in maintaining timekeeping records. Firouzi instead argues that "in November 2016, [MyEyeDr] conducted an analysis of whether it properly classified certain positions exempt based upon new regulations which came into effect in December 2016" but "failed to consider the impact of the new regulations on the GM position." D. 196 at 11. In response, MyEyeDr explains that the DOL "proposed increasing the salary basis threshold for exempt status" in 2016 and contends that it "had no reason to evaluate the status of any roles for which the salary was already higher than the proposed increased threshold," which included the GM role. D. 219 at 2. This conduct is not the sort of "[d]eliberate indifference to the requirements of the law" or reckless disregard for same that would indicate that MyEyeDr acted in willful violation of the statute. LeGoff v. Trs. of Bos. Univ., 23 F. Supp. 2d 120, 125 (D. Mass. 1998) (internal quotation marks and citation omitted).

Firouzi cites Scalia v. World Marble & Granite Corp., No. 19-cv-11211-ADB, 2021 WL 2481255, *9 (D. Mass. June 17, 2021) for the proposition that defendant's failure to consult with counsel or otherwise investigate how to comply with the FLSA demonstrates willfulness. D. 196 at 12. The facts in Scalia, however, are distinguishable from those here. There, defendants had already been subject to an investigation into their pay practices yet the plaintiff contended that they "failed to take any steps to ensure compliance with the FLSA." Scalia, 2021 WL 2481255, at *9-10. The court concluded that "Defendants had no reasonable basis to think that their pay practices during the second investigation period complied with the FLSA because the first investigation put them on notice" of FLSA violations. Id. There, "Defendants knew of the FLSA's overtime requirements" given the prior investigation but failed to "consult with counsel or otherwise

investigate how to comply." Id. at *10. Here, there is no similar prior investigation or form of notice to MyEyeDr.

On this record, no reasonable factfinder could conclude that MyEyeDr acted willfully such that the statute of limitations period would be extended to three years. Firouzi opted into the lawsuit on September 15, 2022, D. 178 ¶ 6; D. 197 ¶ 6, so the two-year limitations period accrued September 15, 2020. Firouzi, however, has not been employed as a GM since April 5, 2020. D. 178 ¶ 5; D. 197 ¶ 5. Accordingly, the Court allows MyEyeDr's motion for summary judgment as to Firouzi.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for class certification, D. 165, and ALLOWS MyEyeDr's motion to decertify the FLSA collectives, D. 210. The Court DENIES MyEyeDr's motion for summary judgment as to Galba-Bright, D. 166, as to Cardona, D. 169, and as to Clark, D. 172, but ALLOWS the motion as to Firouzi, D. 175. The Court DENIES Plaintiffs' motion for partial summary judgment, D. 179. The Court ALLOWS MyEyeDr's motion to preclude the opinion of Plaintiffs' expert, Dr. Fox. D. 208.

**So Ordered.**

/s Denise J. Casper
United States District Judge